616 P.2d 273

**Al BORGES and Marie E. Borges, husband and wife, and G & B Land and Cattle Company, an Idaho Corporation, Plaintiffs–Respondents,**

v.

**MAGIC VALLEY FOODS, INC., an Idaho Corporation, and Magic West, Inc., an Idaho Corporation, Defendants–Appellants.**

No. 12862.

Supreme Court of Idaho.

Sept. 5, 1980.

Donald J. Chisholm of Goodman, Duff & Chisholm, Rupert, for defendants–appellants.

John Hepworth of Hepworth, Nungester & Felton, Buhl, for plaintiffs–respondents.

SHEPARD, Justice.

This is an appeal from a judgment following a jury verdict which awarded plaintiffs–respondents Borges and G & B Land and Cattle Company $12,832.00 for potatoes received by defendant–appellant Magic West pursuant to a contract with respondents. We affirm.

In 1975, respondents grew and harvested approximately 45,000 c. w. t. of potatoes, which were stored in a cellar near Buhl, Idaho. Magic West inspected those potatoes and, although their inspection indicated that some contained a "hollow heart" defect, Magic West agreed to purchase them for $3.80 per c. w. t. "Hollow heart" indicates a vacant space in the middle of the potato. The purchase contract provided that "if internal problems develop making these potatoes unfit for fresh pack shipping, this contract becomes null and void." It was agreed that the cost of transporting the potatoes from the storage cellar to the processing plant would be borne by Magic West. Examination of the potatoes by State inspectors would occur at the plant to determine that the number of potatoes affected by the hollow heart defect did not exceed the limit prescribed for shipping under the fresh pack grade.

The potatoes were transported to the processing plant, where more than 30,000 c. w. t. were processed and shipped under the fresh pack grade. In March, 1976, State inspectors declared the remaining 4,838.77 c. w. t. of potatoes unfit for the fresh pack grade because of the increased incidence of hollow heart condition.[1] On March 31,

---

1. There were also potatoes still in storage which Magic West never paid for due to the hollow heart problems. There is no dispute with regard to those potatoes. Respondents

1976, the parties met to discuss the problem of the remaining potatoes and it was apparently agreed that Magic West should attempt to blend them with other potatoes of a higher grade in the hope that such a blend would meet fresh pack grade standards. That experiment failed and Magic West, without notifying the respondents, processed the remaining 4,838.77 c. w. t. of potatoes into flakes and sold them for $1.25 per c. w. t. The evidence in the record disclosed that the remaining potatoes could not be removed from the processing plant without destroying at least one–third of the potatoes.

Respondents demanded the contract price of $3.80 per c. w. t. for the potatoes sold as flakes. Magic West refused, and instead offered to pay $1.25 per c. w. t. This action resulted. The jury returned a general verdict to the respondents of $12,832.00[2] and the trial court also awarded $6,975.00 as and for attorney fees and costs to the respondents.

Magic West's basic contention is that the 4,838.77 c. w. t. of potatoes were clearly defective and that they were never accepted. It is claimed that when Magic West processed the potatoes into flakes and sold them for $1.25 per c. w. t., they were only following respondents' instructions.

■ The potatoes in the instant case were clearly movable at the time they were identified in the contract, I. C. § 28–2–105, and; hence, were "goods" within the purview of the Idaho Uniform Commercial Code, I. C. §§ 28–2–101 to –2–725, and the dispute is governed by the provisions of the Uniform Commercial Code.

It is clear and undisputed that Magic West had the responsibility of transporting the potatoes from the storage cellar to the

processing plant and that State inspection would occur at the plant. It is also clear that the 4,838.77 c. w. t. of potatoes, unable to make the fresh pack grade, did not conform to the contract and gave Magic West the right of rejection. I. C. § 28–2–601(a). Also, it is not disputed that when Magic West determined that the potatoes would not meet fresh pack grade, Magic West so notified the respondents and met with them to determine what disposition should be made of the potatoes. The record is unclear as to precisely what was decided at that March 31, 1976 meeting, but respondents apparently approved of Magic West's proposal to blend the defective potatoes with those with higher quality in an attempt to meet the fresh pack grade. However, it is clear that no agreement on price was reached at that meeting.

■ A buyer must pay the contract rate for any goods accepted. I. C. § 28–2–607(1). Generally, a buyer is deemed to have accepted defective goods when, knowing of the defect, he resells the goods without notifying the seller. *See* White & Summers, Uniform Commercial Code, § 8–2 (2d ed. 1980); 67 Am.Jur.2d Sales (1973). A buyer accepts goods whenever he does any act inconsistent with the seller's ownership. I. C. § 28–2–606(1)(c). Respondents assert that Magic West's processing of the remaining potatoes into flakes and the subsequent sale constituted acts inconsistent with the respondents' ownership.

Magic West argues, however, that their processing of the potatoes into flakes and their subsequent sale did not constitute an acceptance, but rather was a permissible resale under the provisions of either I. C. § 28–2–603(1) or I. C. § 28–2–604. I. C. § 28–2–603(1) provides:

eventually sold them for $3.00 per c. w. t. to be used as french fries. There were also 702 c. w. t. of defective potatoes in transit to the plant on March 31, 1977. The respondents agreed to accept $1.25 per c. w. t. for those potatoes from Magic West.

**2.** Both parties agreed that the jury had apparently awarded respondents the full contract price of $3.80 per c. w. t. for the potatoes in

dispute. If no deductions were made, a jury award of $3.80 per c. w. t. would have resulted in a jury verdict of $18,387.32 [$3.80 × 4838.77]. Obviously, some deductions were made although they are not apparent from the record and were not explained or challenged by counsel. For purposes of this appeal, we assume, as counsel do, that the jury awarded $3.80 per c. w. t. for the potatoes in dispute.

"Subject to any security interest in the buyer * * *, when the seller has no agent or place of business at the market of rejection a merchant buyer is under a duty after rejection of goods in his possession or control to follow any reasonable instructions received from the seller with respect to the goods and in the absence of such instructions to make reasonable efforts to sell them for the seller's account if they are perishable or threaten to decline in value speedily."

I. C. § 28–2–604 provides:

"Subject to the provisions of the immediately preceding section on perishables if the seller gives no instructions within a reasonable time after notification of rejection the buyer may store the rejected goods for the seller's account or reship them to him or resell them for the seller's account with reimbursement as provided in the preceding section. Such action is not acceptance or conversion.

We note that both I. C. § 28–2–603(1) and I. C. § 28–2–604 were given in their entirety as instructions to the jury. We find it unclear from the record whether the respondents had agents or a place of business at the "market of rejection." Also, the duty to resell under I. C. § 28–2–603(1) is triggered by an absence of instructions from a seller. Here, given the state of the record and its lack of clarity and the conflicting evidence, the jury could have reasonably found that the respondents did instruct Magic West to attempt to blend the potatoes, but did not instruct them to process the potatoes into flakes. While I. C. § 28–2–604 allows a buyer an option to resell rejected goods if the seller gives no instructions within a reasonable time after the notification of rejection, the jury could have reasonably found that respondents' instructions were only to blend the potatoes in hope of accomplishing fresh pack grade and that Magic West's processing of the potatoes into flakes and subsequent resale thereof was a precipitate action taken before the lapse of a reasonable time within which respondents could give further instructions.

In addition, even if a reasonable time had elapsed, thus permitting Magic West to resell the potatoes, the jury properly could have concluded that processing of the potatoes by Magic West was an acceptance rather than a resale. There was no evidence presented either of an attempt to resell the potatoes in the bins to an independent third party, or of the value of the potatoes in the bins, less damage caused by removal, should it have been effected. Absent any evidence that the $1.25 per c. w. t. offered by Magic West was the highest value obtainable for the potatoes, Magic Valley's use of the potatoes in the ordinary course of its own business (presumably for profit) was an act inconsistent with the seller's ownership, and constituted an acceptance of the goods. I. C. § 28–2–606(1)(c).

The jury was adequately and correctly instructed regarding the provisions of I. C. § 28–2–603(1) and I. C. § 28–2–604, which constituted Magic West's theory of its duty or option of resale because of an absence of instructions from respondents. The jury was at liberty to reject Magic West's theory of defense based on substantial, albeit conflicting, evidence that Magic West's resale of the potatoes after processing them into flakes constituted an acceptance and Magic West was hence liable for the full contract price.

We have examined appellants' remaining assignments of error and find them to be without merit.

Affirmed. Costs to respondents.

DONALDSON, C. J., and BAKES, McFADDEN and BISTLINE, JJ., concur.