628 P.2d 1038

**G & H LAND & CATTLE CO., an Idaho Corporation, Plaintiff-Appellant,**

v.

**HEITZMAN & NELSON, INC., an Idaho Corporation, dba Heitzman Produce, Defendant-Respondent.**

No. 13064.

Supreme Court of Idaho.

May 12, 1981.

James C. Tucker of Parry, Robertson, Daly & Larson, Twin Falls, for plaintiff-appellant.

Robert E. Rayborn, and Donald A. Ronayne, of Rayborn, Rayborn, Ronayne & Ritchie, Twin Falls, for defendant-respondent.

McFADDEN, Justice.

On May 23, 1974, Heitzman Produce agreed to purchase from G & H Land & Cattle Company all potatoes to be grown by G & H on its acreage in Jerome County. Heitzman Produce's obligation to purchase was contingent upon the potatoes meeting the size specification set forth in the contract. The potatoes grown did not meet the size specification, and Heitzman Produce refused to accept and pay for the potatoes. G & H brought an action alleging breach of contract. The trial court entered judgment in favor of Heitzman Produce. We affirm.

The facts are not in dispute. The relevant provisions of the contract are as follows:

"3. *Specifications.* All potatoes shall meet the following specifications: 70% or more of said potatoes must be 6 oz. or larger. . . .

. . . .

10. Grade, size and tare shall be established from samples taken by Federal inspections and/or under their supervision or others mutually selected, and by standards of Federal-State Inspection Service. Tare, as used herein, shall include rot, dirt and serious greens (green with 4 oz. clip allowed to seller). Samples to be washed before inspection and Seller or his representative may be present at taking

of inspection of samples. Decision of Federal-State Inspectors to be binding on all parties concerned. Inspection fee shall be divided equally between Seller and Buyer. All dirt and debris accumulated prior to the point of where sample is taken at delivery shall be weighed back over scales as part of light loan weight."

G & H began harvesting the contract potatoes on September 26 or 27, 1974. During the first day of harvest, Edward Harper, the president of G & H, noticed that the potatoes did not appear to meet the contract specifications. On that same date, Mr. Harper telephoned Edward Heitzman, the president of Heitzman Produce, and advised him that the harvesting of the potatoes had begun and of the apparent failure of the potatoes harvested to meet the size requirement of the contract.

Within several days after that telephone conversation, Mr. Heitzman personally inspected the potatoes being harvested and expressed his agreement with Mr. Harper that the potatoes were undersized and would not meet the contract specifications. Also, in early October, Joseph Schwartz, a potato buyer for a California potato processing plant, and Harold Artunian, the president of the processing plant, personally inspected the potatoes being harvested in the field. Mr. Artunian advised Mr. Harper at that time that the potatoes did not meet the contract specifications regarding size.

On October 2 and 3, 1974, two truck loads of potatoes were taken from G & H's field and were transported by Heitzman Produce to Mr. Artunian's California processing plant. Approximately three weeks thereafter, Heitzman Produce was notified by Mr. Artunian that the potatoes shipped were too small to be used in his processing equipment. Mr. Heitzman then telephoned Mr. Harper and informed him that the potatoes were too small and were not "usable." Heitzman Produce paid the contract price for the two loads of potatoes, Mr. Heitzman testifying that it is common practice to pay for any potatoes tested in order to keep the goodwill of the growers.

G & H continued to harvest the potatoes through October 23, 1974. In total, 111 loads of potatoes were placed in G & H's ranch storage facilities. Pursuant to the agreement, an additional 10 loads were transported to, and stored in, storage facilities owned by Heitzman Produce, as G & H's facilities could not adequately store the entire crop.

On November 6 or 7, 1974, approximately two weeks after the completion of the harvest Heitzman Produce began preparations for removing the potatoes from storage. Mike Heitzman, an employee of Heitzman Produce, was in charge of the loading, and commenced with the ten loads stored in their cellar. On November 15, 1974, an inspection for size pursuant to the contract was done by Max Moffatt, a state potato inspector. Mr. Moffatt inspected three of the ten loads of the potatoes as they came out of storage and determined that only 39.2% of the potatoes were six ounces or over. Based on this inspection Heitzman Produce, through Mike Heitzman, orally informed G & H on November 18, 1974, that it was rejecting the balance of the crop. Heitzman Produce paid for all ten loads of potatoes transported and subject to inspection, again for the purpose of goodwill.

Mr. Harper, Mr. Heitzman and Mr. Schwartz met on December 7, 1974, to discuss the rejection of the balance of the crop. Mr. Harper requested that another test be conducted to determine if the potatoes met contract specifications. A test of 105,000 pounds of potatoes was conducted by a state inspector on December 14, 1974, with the results showing only 54% of the potatoes being six ounces or over. Based upon this test Heitzman Produce again rejected the potatoes; however, they paid for the potatoes tested, as was the company's custom. In total, Heitzman Produce paid the contract price for 439,500 pounds of potatoes, representing the two loads taken to California, the ten loads subject to inspection on November 15, 1974, and the two loads inspected on December 14, 1974.

Thereafter, pursuant to Mr. Harper's request, on December 13, 1974, Heitzman Pro-

duce served G & H with a written notice of rejection.

On April 13, 1977, G & H filed this claim against Heitzman Produce alleging breach of contract. After hearing the case, the district court judge in his memorandum opinion specifically found that the size requirement for the potatoes contained in the contract was never modified by the parties nor waived by Heitzman Produce; and that Heitzman Produce had no obligation to accept any of the potatoes since they did not meet the size specification. Accordingly, judgment was entered in favor of Heitzman Produce on August 1, 1978, with costs and attorney fees awarded to Heitzman Produce.

On appeal, G & H contends that the trial court erred in failing to consider any applicable provisions of the Uniform Commercial Code (UCC) as adopted in Idaho, and that pursuant to the UCC, Heitzman Produce did not act reasonably in rejecting the nonconforming potatoes tendered to it by G & H. Heitzman Produce counters that the trial court reached the proper decision, and that at all times it acted in a commercially reasonable manner.

■ As in the case of *Borges v. Magic Foods, Inc.*, 101 Idaho 494, 616 P.2d 273 (1980), the potatoes here were movable at the time they were identified in the contract, therefore were "goods" within the purview of the UCC, I.C. § 28–2–105, and consequently, the transaction in dispute is governed by the UCC as adopted in this state, I.C. §§ 28–2–101 et seq.

■ Whether the trial court's disregard of the UCC is to be considered as error, harmless or reversible, is dependent upon our determination whether the decision below can be sustained under the applicable provisions of the UCC. The case law is replete with decisions holding that if a decision of a lower court is correct, but is founded on an incorrect theory, it will be affirmed on appeal upon the correct theory. *See, e. g., Robison v. Compton*, 97 Idaho 615, 549 P.2d 274 (1976); *City of Weippe v. Yarno*, 96 Idaho 319, 528 P.2d 201 (1974);

*Lemmon v. Hardy*, 95 Idaho 778, 519 P.2d 1168 (1974).

A review of the UCC provisions applicable to the instant case necessarily begins with I.C. § 28–2–606(1), which provides for three modes of acceptance by a buyer. "*28–2–606. What constitutes acceptance of goods*—(1) Acceptance of goods occurs when the buyer (a) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their nonconformity; or (b) fails to make an effective rejection (subsection (1) of section 28–2–602), but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or (c) does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him." In connection with this provision, I.C. § 28–2–602(1) provides: "rejection of goods must be within a reasonable time after their delivery or tender. It is ineffective unless the buyer seasonably notifies the seller."

■ The concepts of a reasonable time period for rejection and a reasonable opportunity to inspect under I.C. § 28–2–606(1)(b) necessarily overlap. That is, if inspection indicates the goods are nonconforming, there remains the obligation to reject within a reasonable time. But where the buyer does not avail himself of his right to a reasonable opportunity to inspect, he thereby fails to reject within a reasonable time. *See, e. g., Miron v. Yonkers Raceway, Inc.*, 400 F.2d 112 (2d Cir. 1968); *Economy Forms Corp. v. Kandy, Inc.*, 391 F.Supp. 944 (D.C.Ga.1974), *aff'd without op.* 511 F.2d 1400 (5th Cir. 1975); *Brodsky v. Nerud*, 68 A.D.2d 876, 414 N.Y.S.2d 38 (1979). The thrust of appellant's argument is directed toward this later situation, and we will accordingly first direct our attention to that issue.

A buyer's right to inspect the goods is defined in I.C. § 28–2–513(1), which provides that a buyer has a right before payment or acceptance to inspect the goods

tendered or delivered at any reasonable place and time and in any reasonable manner. However, the method and manner of inspection may be fixed by the parties, and such a contractual provision is presumed to be exclusive. I.C. § 28–2–513(4).

■ It has generally been held that what constitutes a reasonable time within which the buyer must make an inspection of the goods to determine whether they are conforming is a question of fact to be determined by the trier of fact. *Dopieralla v. Arkansas-Louisiana Gas Co.*, 499 S.W.2d 610 (Ark.1973); *Luther v. Standard Conveyor Co.*, 252 Minn. 135, 89 N.W.2d 179 (1958); *Freier v. Shayani*, 183 N.Y.S.2d 198 (1958); *Magnavox Co. v. Royson Engineering Co.*, 195 Pa.Super. 139, 169 A.2d 559 (1961). However, where the facts are not in dispute or the matter can be ascertained from the language of the contract, it may be determined as a matter of law. *Beco, Inc. v. Minnechaug Golf Course, Inc.*, 5 Conn.Cir. 444, 256 A.2d 522 (1968); *LaVilla Fair v. Lewis Carpet Mills, Inc.*, 219 Kan. 395, 548 P.2d 825 (1976); *Magnavox Co. v. Rayson Engineering Co., supra.*

In the instant case, the undisputed facts and the language of the contract lead to only one conclusion: the respondent exercised his right of inspection promptly and with due diligence. The parties agreed that the potatoes were to be inspected for size by government inspectors, the decision of the inspectors would be binding, and the inspection was to be "taken at delivery." A review of the contract indicates that delivery was to be made when the potatoes came out of storage. Specifically, paragraph 2 of the contract sets out the price and the place of delivery.

"2. The Buyer shall pay to the Seller for all potatoes meeting the specifications hereinafter set forth the price determined on the following schedule, to-wit:

All potatoes delivered in November or before 1974—$3.75 cwt. All potatoes delivered in December, 1974—$3.85 cwt. All potatoes delivered in January 1975—$4.00 cwt.

Delivery shall be made by Seller at its cellar situated near Jerome, Idaho. Payment for all potatoes shall be made for each month's delivery on the 10th day of the next succeeding month, following delivery."

The contractual provision contemplates delivery over the course of several months, and payment in the month following each delivery. Likewise, there can be no question that delivery was to be made when the potatoes came out of storage, for the price is conditioned on their weight at such time.[1] The first potatoes came out of storage sometime after November 6, 1974, the government inspector was present at this time, and his inspection showing that only 39.2 percent of the potatoes were six ounces or larger was dated November 15, 1974. Under these circumstances, respondent exercised his right of inspection promptly and in accordance with the applicable provisions of the contract.

■ The conclusion that respondent acted reasonably is not lessened by the fact

---

1. Other provisions of the contract also disclose that the parties contemplated delivery to occur when the potatoes came out of storage. Paragraph 7 of the contract covered the down payment, providing that:

"7. Seller acknowledges receipt of the sum of $10,000.00 to him in hand paid by Buyer, which said sum shall be applied toward the purchase price of said potatoes and shall be applied toward the earliest delivery tendered by Seller and accepted by Buyer."

This provision applies the down payment toward the "earliest delivery," establishing that there was to be more than one delivery date, which could only mean when the potatoes came out of storage.

Paragraph 8 of the contract covered risk of loss:

"8. That title to produce shall pass to Buyer upon being loaded on truck or delivery car at delivery point shown above. Risk of loss shall be upon Seller until title passes to Buyer. Buyer may elect before delivery to insure all or any part of the produce being sold hereunder."

The risk of loss therefore passes at delivery, which occurs when the potatoes are loaded for transportation. This provision further establishes delivery as the time when the potatoes came out of storage to be loaded for transport.

that its employees had several opportunities to inspect the potatoes prior to the delivery date. The parties expressly contracted for inspection at delivery, and the method and manner of the inspection contracted for is presumed to be exclusive. I.C. § 28–2–513(4). This being the case, the respondent had no duty to have the potatoes inspected prior to delivery, and it is irrelevant that they could have been inspected earlier.

The next issue to be considered on appeal is whether the respondent accepted the potatoes as tendered by failing to make a timely rejection as contemplated by I.C. § 28–2–602(1). That section requires that the rejection of the goods be made within a reasonable time after tender or delivery, and such rejection is ineffective "unless the buyer seasonably notifies the seller." *Id.* The question of what is a reasonable time for the rejection of nonconforming goods by a buyer depends upon "the nature, purposes and circumstances" of the transaction. I.C. § 28–1–204(2). Where, as here, the facts are undisputed, the question is one of law for the court. *Lynx, Inc. v. Ordnance Products, Inc.,* 273 Md. 1, 327 A.2d 502 (1974); *Pace v. Sagebrush Sales Co.,* 114 Ariz. 271, 560 P.2d 789 (1977).

The record establishes that the inspection of the first potatoes delivered was completed on Friday, November 15, 1974. On Monday, November 18, 1974, Mike Heitzman orally informed appellant that respondent was rejecting the potatoes. Neither party disputes that the rejection was absolute and unequivocal. Thus, the rejection was given to the appellant on the first normal working day immediately following the inspection. On these facts, the conclusion is inescapable that the rejection of the potatoes on the basis of their nonconformity with the contract specifications was within a reasonable time, and otherwise effective.

The final issue on appeal is whether respondent's partial acceptance of several loads of the potatoes precluded subsequent rejection of the nonconforming potatoes. Despite the fact that all the potatoes to the contract were nonconforming, the respondent paid the contract price for the potatoes which were inspected. Appellant argues that such partial acceptance amounts to an acceptance of all of the potatoes. The argument is without merit.

I.C. § 28–2–606(1)(c) reads as follows:
*"28–2–606. What constitutes acceptance of goods*—(1) Acceptance of goods occurs when the buyer

. . . .

(c) does any act inconsistent with the seller's ownership, but if such act is wrongful as against the seller it is an acceptance only if ratified by him."

Facially, this section supports appellant's argument. However, it cannot be read in a vacuum. Other sections of the UCC deal with this particular issue, including I.C. § 28–2–601:
*"28–2–601. Buyer's rights on improper delivery.*—Subject to the provisions of this chapter on breach in installment contracts (section 28–2–612) and unless otherwise agreed under the sections on contractual limitations of remedy (sections 28–2–718 and 28–2–719), if the goods or the tender of delivery fail in any respect to conform to the contract, the buyer may
  (a) reject the whole; or
  (b) accept the whole; or
  (c) *accept any commercial unit or units and reject the rest."* (Emphasis added.)

Recourse must also be had to I.C. § 28–2–607.
*"28–2–607. Effect of acceptance—Notice of breach—Burden of establishing breach after acceptance—Notice of claim or litigation to person answerable over.*—(1) The buyer must pay at the contract rate for any goods accepted."

These sections provide that the buyer may accept any commercial units to a contract and reject the rest, and that the contract price must be paid for the units accepted. The contract provided for delivery at different times, and inspection at the time of each delivery. The contract being divisible in nature, partial acceptance and partial rejection was a procedure available to respondent. I.C. § 28–2–601(c).

The court concludes that the judgment below is correct. Therefore, although the judgment of the trial court was entered on a differing theory, it is affirmed on the basis of the views expressed herein.

Judgment affirmed. Costs to respondents. Appellant's request for attorney fees on appeal is denied.

BAKES, C. J., and DONALDSON, J., concur.

SHEPARD, J., sat but did not participate.

BISTLINE, Justice, specially concurring.

In the present case, the respondent urged and argued the provisions of the U.C.C. to the trial court. Hence I concur. However, it is necessary to comment on the statement by the Court that "case law is replete with decisions holding that if a decision of a lower court is correct, but is founded on an incorrect theory, it will be affirmed on appeal upon the correct theory." This statement is correct only insofar as it goes, which is a bit short. There is another well established and complete rule that parties will be held to the theories upon which the cause was tried in the lower court. *Silver Syndicate, Inc. v. Sunshine Mining Co.*, 101 Idaho 226, 611 P.2d 1011 (1979); *Frasier v. Carter*, 92 Idaho 79, 437 P.2d 32 (1968); *Christensen v. Stucklik*, 91 Idaho 504, 427 P.2d 278 (1967); *Frost v. Mead*, 86 Idaho 155, 383 P.2d 834 (1963); *Robinson v. Spicer*, 86 Idaho 138, 383 P.2d 844 (1963). I must again emphasize that this Court ought not find itself affirming on a theory differing from that used by the trial court where that different theory was not presented to the trial court. It is a corollary of the rule that this Court ought not reverse on a theory never advanced in the trial court, and not even urged in this Court, a most recent and glaring example of which was *Lamb v. Robinson*, 101 Idaho 703, 620 P.2d 276 (1980).