845 P.2d 567

**Manuel FIGUEROA, dba Friendship Truck Express, Plaintiff–Respondent,**

v.

**KIT–SAN COMPANY, aka Kit–San Azusa, Inc., and the Travelers Indemnity Company, Defendants–Appellants.**

**H & H BENTONITE AND MUD, INC., Plaintiff–Respondent,**

v.

**KIT–SAN COMPANY, aka Kit–San Azusa, Inc., and the Travelers Indemnity Company, Defendants–Appellants.**

Nos. 18325, 18872.

Court of Appeals of Idaho.

July 6, 1992.

Rehearing Denied Dec. 11, 1992.

Petition for Review Denied Feb. 18, 1993.

Randall, Blake, Cox, Risley & Trout, Lewiston, for defendants-appellants. Kim Jay Trout, argued.

Marcus, Merrick & Montgomery, Boise, for plaintiffs-respondents. Gale M. Merrick, argued.

WALTERS, Chief Judge.

This is a breach of contract case involving the seller of a special type of clay called bentonite, the trucking company that shipped the clay, and the buyer who intended to use the clay to line a sewage treatment lagoon. The clay was supplied and shipped, but ultimately was not used because it allegedly did not meet specifications. The buyer did not pay for the clay or the shipping. The seller and the trucking company sued the buyer, who defended and filed a third-party action against the seller asserting that the clay was not the quality promised and the seller was the only party who had contracted with the trucking company. The cases were consolidated, the third-party complaint was dismissed, and the district court entered judgments in favor of the seller and the trucking company. The buyer appeals. We reverse.

## FACTS AND PROCEDURAL BACKGROUND

In July, 1984, appellant Kit–San Azusa Company (Kit–San), defendant/third-party plaintiff below, won a contract to expand the wastewater treatment facilities for the city of St. Maries, Idaho. The first step in the project was to build a 24 acre "polishing lagoon." Due to weather and the water table at the site, the lagoon had to be built in the late summer or early fall, when the ground was driest. To build the lagoon, Kit–San was required to use a type of clay called bentonite, which occurs naturally in Wyoming and Utah and is used because it swells when exposed to water and makes a good natural sealant. Sometimes, however, bentonite must be treated with inorganic polymers to provide a good seal.

Brown and Caldwell, the city's engineering firm, specified that Kit–San use a "high swelling sodium based Wyoming bentonite containing an optimum level of anionic or non-ionic organic polymer," having a specif-

ic fineness grade and not allowing a seepage rate in excess of $1 \times 10^{-7}$ centimeters per second. Kit–San was required to submit test results from the bentonite supplier showing that bentonite similar to that furnished was tested within the last year and met all the specified requirements, including a 200 day permeability test.

During the spring of 1984, H & H Bentonite and Mud, Inc., (H & H), the respondent/plaintiff/third-party defendant, learned of Kit–San's involvement in the project. On April 25, 1984, a salesman at H & H, Robert McClung, sent a letter to Kit–San addressed "To Whom It May Concern" and quoting prices for various types of bentonite. The letter stated that H & H had been in contact with Brown and Caldwell about the project and enclosed a brochure describing some of the qualities of H & H bentonite, which was available from Salina, Utah. The brochure stated that, "It usually takes 2–3 lbs. per square foot of this bentonite to meet the EPA requirement of $10^{-7}$." In the letter, McClung stated, "We ask that you pay freight companies directly. If you can help get better rates, great!"

Kit–San also considered a proposal from another supplier, American Colloid, for the use of Wyoming polymered bentonite. Kit–San eventually was awarded the contract for the construction of the sewage lagoon upon its proposal to use American Colloid's bentonite at prices quoted to Kit–San by American Colloid. The projected application rate was 2.3 lbs. per square foot based on this product. Unfortunately, when the time came for actual purchase and delivery, no trucks were available, causing a construction delay. The delay was exacerbated by extra time spent dealing with a soil compaction problem and an error setting grade stakes for the lagoon. Ultimately, because of the trucking problem, Kit–San sought an alternative supplier of bentonite, resulting in renewed negotiations with H & H.

Richard Imus, the person at Kit–San responsible for the project, became aware of McClung's letter from H & H. On October 9, 1984, Imus phoned H & H and talked to its president, Douglas Hawke. Gene Johnson, the project engineer from Brown and Caldwell, was with Imus during the conversation. Before the call was made, Johnson told Imus that he, Johnson, did not know the quality of the H & H bentonite, that it would have to equal the quality of American Colloid's product, and if Imus ordered the material from H & H he was doing so at his own risk. He also told Imus that the H & H bentonite would have to be tested upon arrival and would have to meet specifications.

During the phone call, Hawke offered Imus a delivered price of $80.00 per ton, including freight. Based on Kit–San's urgent need and H & H's representations that its bentonite was "as good or better than American Colloid bentonite," Imus accepted the offer, f.o.b. St. Maries, and ordered 1,150 tons. This amount was based upon the 2.3 lbs. per square foot estimated application rate for the American Colloid product, even though Kit–San and H & H were aware that the soil compaction problem might require a higher application rate.

The same day, Hawke sent a handwritten note to Imus to confirm the details of their telephone agreement. The note stated:

Dear Dick: I am writing long hand in time for Federal Express. Delivered price is $80.00 per ton [i]ncluding freight less 2.00 [sic] a ton discount if paid within 30 days. Thanks Douglas M. Hawke

The letter was received by Kit–San on October 10, 1984. On October 11, Hawke sent another letter to Kit–San accompanied by duplicate sales contracts. In the letter of October 11, Hawke wrote that the product being shipped was Utah bentonite, "a high-grade sodium bentonite which has been approved by several government agencies" and described as "⅛th inch to minus 200 mesh grade of bentonite which will work very well in your St. Maries sewage lagoon project." The letter referred to test results conducted previously by two independent laboratories and already mailed to Imus. Imus had sent the results to Brown and Caldwell, which returned them on October 16, 1984, essentially saying that the tests were insufficient

because they did not address a 200 day test, laboratory permeability, application rate, or what type polymers were used and in what percentage. In other words, the submitted test results did not show that the bentonite complied with project requirements.

The contracts which Hawke sent to Imus recited a sale of 1,150 tons of bentonite for $38 per ton, f.o.b., Salina, Utah. They also stated that Kit–San would be responsible for paying freight costs of $42 a ton to the trucking firm within ten days after delivery and that H & H was "responsible for delivery of the bentonite to the project site," but was not responsible for the "design, application, functioning or operation of the project." Imus became concerned that the freight charges had been separated from the overall price and that Kit–San would be directly responsible for paying the trucking firm within ten days of delivery. He was also concerned that Kit–San was, in his view, disclaiming any warranty for the bentonite. However, Imus did not notify H & H of his disagreement with the proposed contracts. He wanted time to test the bentonite. Therefore, he did not communicate his objections or return the contracts to H & H, but left them unsigned in his files.

Delivery of the bentonite began on October 10, 1984. Thereafter, Kit–San hired the engineering firm of Budinger and Associates (Budinger) to test and compare the H & H and American Colloid bentonite. Imus was concerned that the H & H bentonite be of equal quality to the American Colloid bentonite so that the contract specifications would be met, no greater quantity would be needed, and no greater cost would be incurred by Kit–San. Evidence indicates that although Kit–San had won the contract based on an American Colloid bentonite application rate of 2.3 lbs. per square foot, it did not actually know what rate would be required considering the soil compaction problems it had encountered.

On October 31, 1984, Budinger sent a letter to Brown and Caldwell telling them that the H & H bentonite, using an application rate of 3.8 lbs. per square foot, produced test results indicating that the

permeability (seepage rate) value was approximately three times greater than the value allowed by the specifications. Brown and Caldwell notified Imus at Kit–San, and Imus called H & H to stop shipment.

From the time shipping started until it was stopped on October 31, thirty-nine truck loads (approximately 983 tons) had been delivered to St. Maries by Manuel Figueroa and his company, Friendship Truck Express (Friendship). At trial, Imus testified that he stopped the deliveries because of the unfavorable test results. He also testified that he and Hawke talked about the lack of polymers in the bentonite and that Hawke responded by saying no polymers were needed and mailed some information to support the claim. On the other hand, Hawke testified that Imus stopped the deliveries because wet, winter weather had set in precluding construction until the spring. Evidence indicates that there was some discussion regarding the quality of the bentonite during the phone call on October 31, however, Brown and Caldwell's daily inspection notes for the project also reveal that the weather was becoming cold and wet, with occasional rain, and snow the next day.

On November 8, 1984, Budinger sent a second letter to Brown and Caldwell advising them that another test of the American Colloid sample produced the required permeability at an application rate of 3.1 lbs. per square foot. Budinger also told the engineers that the H & H product would require a greater application rate, but that further testing was required. A letter followed on February 11, 1985, in which Budinger stated that the H & H bentonite required an application rate roughly twice as high as American Colloid. Importantly, the tests revealed that neither product would achieve the originally estimated 2.3 lbs. per square foot application rate, and that the quality of H & H bentonite was very dependent on how carefully it was mixed.

On March 22, 1985, Brown and Caldwell wrote to Imus advising him their tests indicated that from 55 to 96 percent more H & H bentonite was required to achieve the

same permeability as American Colloid and that the H & H bentonite was more sensitive to mixing. The letter included an authorization for a change in product or application rate. Essentially, however, Brown and Caldwell was telling Kit–San to use American Colloid bentonite or pay for the extra H & H material required.

Ultimately, Kit–San used 34 tons of the H & H material in non-critical areas. The lining of the lagoon was completed in September, 1985, using 2,127 tons of American Colloid bentonite applied at 4.08 lbs. per square foot. At trial, Mr. Budinger stated that the contractor did a better than average job of mixing since the tests indicated a moderate mix would require an application rate of 8.3 lbs. per square foot. Over 900 tons of H & H bentonite was reportedly left unused at the project site.

Meanwhile, Friendship and H & H had not been paid. Both submitted claims under I.C. § 54–1927 against Kit–San's performance bond and filed complaints on February 8, 1985, and March 8, 1985, respectively. On May 10, 1985, Kit–San sent a letter to H & H formally objecting to the written contracts, denying liability, claiming that H & H had misrepresented its product, supplied unsuitable bentonite, and that H & H must make the bentonite conform to the oral contract or remove it.

Kit–San answered Friendship's complaint, counterclaimed, and filed a third-party action against H & H. The cases were consolidated and the third-party action dismissed. The district court granted judgment to H & H for $69,910.90 in principal and interest, and to Friendship for $65,324.93 in principal, interest, and costs. Kit–San appeals from both judgments. The cases have been consolidated for disposition on appeal.

### ASSIGNMENTS OF ERROR

1. Did the district court err when it determined the terms of the contract between Kit–San and H & H?
2. Did the court err when it found that Kit–San did not seasonably reject the goods and therefore accepted them?

3. Did the court err when it found that there was a breach of an express warranty but that it was nullified by Kit–San's acceptance of the goods?
4. Did the court err when it determined that there was no breach of a warranty for a particular purpose?
5. Did the court err when it found a contract existed between Kit–San and Friendship?

### STANDARD OF REVIEW

■ This case presents questions of fact as to the negotiations and actions of the parties, but questions of law as to whether the actions formed a contract. An appellate court will defer to the trial court's findings of fact based upon substantial evidence, but will review freely the conclusions of law reached by stating legal rules or principles and applying them to the facts found. *Staggie v. Idaho Falls Consol. Hospitals,* 110 Idaho 349, 715 P.2d 1019 (Ct.App.1986); *see, e.g., City of Burley v. McCaslin Lumber Co.,* 107 Idaho 906, 693 P.2d 1108 (Ct.App.1984); *Standards of Appellate Review,* IDAHO APPELLATE HANDBOOK § 3.2.2 (Idaho Law Foundation, Inc. 1985). Accordingly, in the present case, we will uphold factual findings made by the district court as long as they are not "clearly erroneous." *Staggie, supra.* We will review freely any statements of law and the court's conclusion that the facts as found did not entitle Kit–San to any relief. *Id.*

#### 1. Contract Terms

Initially, we examine whether the court erred in its determination of the terms of the contract between H & H and Kit–San. Our resolution of this issue also will determine whether a contract existed between Kit–San and Friendship.

■ This case involves a contract for the sale of movable goods worth over $500, therefore, chapter two of Idaho's Uniform Commercial Code (the code) applies. I.C. § 28–2–105; *Borges v. Magic Valley Foods, Inc.,* 101 Idaho 494, 616 P.2d 273 (1980). Generally, contracts for the sale of goods over $500 must be in writing to be

enforceable. I.C. § 28-2-201. However, an oral contract may be enforceable if a party admits in pleadings or in court that a contract was made. I.C. § 28-2-201(3)(b). Here, both H & H and Kit-San admitted in their pleadings and in court that a contract existed. Further, it is undisputed that Kit-San ordered bentonite which H & H had delivered. Therefore, the dispute concerns only the terms of the contract. H & H maintains that the terms of its formal contract of October 11, 1984, govern, even though Kit-San never signed or expressly accepted that version. Kit-San, however, argues that the contract must rest on H & H's oral agreement established by the telephone conversation of October 9, 1984, and the confirmatory memorandum written and mailed by Hawke that day.

■ Parties to a contract must have a mutual understanding or meeting of the minds regarding essential contract terms in order for the contract to be binding. *Thomas v. Schmelzer*, 118 Idaho 353, 796 P.2d 1026 (Ct.App.1990); 67 AM.JUR.2D *Sales* § 129, p. 398 (1985). A meeting of the minds requires an expression of assent or conduct sufficient to show agreement. 67 AM.JUR.2D *Sales* § 129, p. 398.

H & H provided Kit-San with several preliminary price statements before the latter placed an order. Robert McClung's letter of April 25, 1984, quoted different prices for unpolymered Utah bentonite delivered f.o.b. Utah and Idaho, and stated, "We ask that you pay freight companies directly." It also quoted a price for Wyoming polymered bentonite. H & H's letter of June 22, 1984, quoted a price of $80.50 a ton delivered to St. Maries, with a discount of two dollars a ton if paid within twenty days of invoice. The actual acceptance of any offer, however, did not take place until Imus called Hawke on October 9, 1984. During that conversation, Hawke offered Utah bentonite at $80 per ton including freight, which Imus assented to with delivery of 1,150 tons f.o.b. St. Maries. The same day, Hawke sent a confirmatory memorandum stating, "Delivered price is $80 a ton [i]ncluding freight less $2 a ton discount if paid in 30 days." Evidence

indicates that the parties discussed paying the freight company directly, but only that Kit-San "expressed a willingness to consider such a payment method." On October 11, 1984, however, Hawke mailed H & H's formal contract which differed from the oral contract in that it divided the product and freight charges and required that Kit-San pay the freight company directly on a different schedule. It also stated that H & H was responsible for delivery of the bentonite to the project site, but not responsible for the design, application, functioning or operation of the project.

■ The court found that the different price, freight, and delivery terms of the proposed written contract controlled, that the oral agreement established a product price of $38 per ton, and that any changes to the oral agreement by the written contract were ratified by Kit-San when it failed to notify H & H of any objections to the terms of the written contract.

We find the court's conclusions not to be supported by substantial evidence. Both Imus and Hawke testified that the oral agreement was for $80 a ton delivered. The April 25th letter stating a $38 price and relied on by the court as a basis of understanding between the parties was merely a preliminary price quote made six months before the actual order. Hawke's handwritten note of October 9 confirmed the details of the oral contract and prevails over the preliminary discussions.

■ In the same regard, Hawke's formal contract of October 11, 1984, was not a confirmatory memorandum stating additional terms that were assented to by Kit-San, but was a completely new offer. The court found this offer accepted by Kit-San's failure to object. This finding is also erroneous. Silence ordinarily does not establish acceptance without knowledge that silence is a mode of acceptance and the offeree intends to accept. *Vogt v. Madden*, 110 Idaho 6, 713 P.2d 442 (Ct.App. 1985); *Eimco Div., Envirotech Corp. v. United Pacific Ins. Co.*, 109 Idaho 762, 710 P.2d 672 (Ct.App.1985); *See* J. CALAMARI AND J. PERILLO, CONTRACTS § 2-21, p. 63-68 (2nd ed. 1977). A party cannot

state an agreement on his own terms and unilaterally form a contract. *D.R. Curtis Company v. Mason,* 103 Idaho 476, 649 P.2d 1232 (Ct.App.1982). Kit–San did not assent to the terms in the formal contract and apparently did not intend to assent.

 If, however, one takes the view that the formal contract was in fact a written confirmation with additional terms, the additional terms "are to be construed as proposals for addition to the contract." I.C. § 28–2–207(2). In this regard, the district court's position is supported by Comment 6 to § 28–2–207, which states that additional terms may be deemed accepted if no objection or answer is received within a reasonable time. However, commentators have suggested that "it is doubtful that this comment relates to the first sentence of subdivision 2. *Cf.* Restatement, Contracts (2d) § 60, Comment a; U.C.C. § 2–201, Comment 3." J. CALAMARI AND J. PERILLO, CONTRACTS, *supra,* p. 70, n. 63. Notwithstanding such doubt, the oral agreement, confirmed by the October 9 handwritten note, contradicted the later written contract. Additional or different terms will not become part of the agreement if they materially alter the original bargain. I.C. § 28–2–207, Comment 3. The additional terms here materially altered the terms in that they affected the price, the schedule of payment, who to pay, and the risk of loss during delivery. The record indicates that Kit–San did not assent to dividing the cost and to paying the trucking company directly or to the attempt to disclaim any warranty for the goods or the operation of the project. At the time shipping started, Kit–San did not know who the trucking company was, for it had not been named in any of H & H's communications with Kit–San. In this case, then, the contradicting terms in the formal agreement "fall out." *See* J. WHITE AND R. SUMMERS, UNIFORM COMMERCIAL CODE § 1–3, p. 41–46 (3rd ed. 1988).

### 2. Acceptance/Rejection of Goods

Having determined that the district court erred when it found that the terms of the oral contract had been modified by the later formal contract, the issue remains whether Kit–San became obligated to pay for the bentonite and its delivery under the oral contract when it failed to reject the goods until May 10, 1985, over six months after delivery and nearly a month after Kit–San had actually appeared in the legal actions brought by H & H and Friendship.

The court found that six months was not a reasonable time for rejection, the rejection was ineffective, and Kit–San had accepted 34 of the 983 tons of bentonite shipped, and therefore was liable for the entire shipment. Kit–San argues that it notified H & H of its rejection on October 31, 1984. It also asserts that its use of 34 tons was in mitigation and does not constitute acceptance.

 If the goods or the tender of delivery in a contract for the sale of goods fail to conform to the contract, the buyer may reject or accept the whole, or may accept any commercial unit or units and reject the remainder. I.C. § 28–2–601. Acceptance of goods occurs when the buyer fails to make an effective rejection after a reasonable time and opportunity to inspect the goods, or does any act inconsistent with the seller's ownership. I.C. § 28–2–606(1)(b), (c); *G & H Land & Cattle Co. v. Heitzman & Nelson, Inc.,* 102 Idaho 204, 628 P.2d 1038 (1981). Upon acceptance, the buyer must pay at the contract rate for any goods accepted and loses his right to reject. I.C. § 28–2–607(1), (2).

 A rejection of goods must be within a reasonable time after their delivery or tender, and the buyer must seasonably notify the seller of the rejection. I.C. § 28–2–602(1); *G & H Land & Cattle, supra.* In other words, the buyer must take affirmative action to avoid acceptance. I.C. § 28–2–602, Comment 1. An action taken within a reasonable time is taken "seasonably." I.C. § 28–2–204(3).

 As with rejection, after delivery and before acceptance the buyer is given a reasonable time to inspect the goods. I.C. § 28–2–513(1); I.C. § 28–2–606(1)(b); *G & H Land & Cattle, supra;* ANNOT., *Sale—*

*Inspection by Buyer*, 52 A.L.R.2d 900 (1957). If the goods do not conform in kind, quality, condition, or amount they may be rejected. 67 AM.JUR.2D *Sales* § 610, p. 901. What is a reasonable time is primarily a question of fact; however, where the facts are not substantially in dispute, it becomes a question of law to be resolved by the court. 67 AM.JUR.2D § 72, p. 333–34; *G & H Land & Cattle, supra. See also* ANNOT., *Time, Place, and Manner of Buyer's Inspection of Goods Under UCC § 2–513*, 36 A.L.R.4th 726 (1985). The code does not define what is a "reasonable" time, either in the context of inspection or rejection. However, several factors relevant to whether a reasonable time has passed for inspection and rejection are: (1) the difficulty in discovering the defect; (2) the terms of the contract; (3) the relative perishability of the goods; and (4) the course of performance after the sale and before the formal rejection. J. WHITE AND R. SUMMERS, UNIFORM COMMERCIAL CODE § 8–3, p. 362 (3rd. ed. 1988).

### 2A. Rejection Occurred On May 10, 1985

 The court found the goods were rejected on May 10, 1985. Kit–San claims that it rejected the goods orally on October 31, 1984, when Imus phoned Hawke and told him to discontinue deliveries because the bentonite did not conform to the contract or H & H's representations.

Evidence indicates that when Imus stopped the shipments on October 31, 1984, he did so at least partly because of the dubious suitability of the bentonite. On the other hand, Hawke testified that the shipments were stopped because of bad weather. The court stated:

> There is no question that, on October 31, 1984, Kit–San, through Imus, notified H & H that the bentonite did not appear to be of the same quality as the American Colloid product with respect to permeability. However, Kit–San did not reject the material at the time. No notice was given to H & H at that time which would have initiated any action on the part of the seller.

We find the court's conclusion correct that notice of rejection was not made until May 10, 1985. Kit–San's statement of October 31, 1984, was merely an expression that the goods were non-conforming. We also conclude that Kit–San's statement of rejection in May was sufficiently formal to notify H & H of Kit–San's intent, and of the need for H & H to cure or remove the goods.

### 2B. The Timing of the Rejection was Reasonable

 The question remains, however, whether the court erred when it found that the rejection was not made within a reasonable time after delivery. In this regard, we hold that the court erred.

Kit–San hired Budinger and began the inspection process as soon as the bentonite was delivered. By October 31, 1984, initial results were communicated to Kit–San, which called H & H to discuss the quality of the product and stop deliveries, possibly for the combined reason that winter was setting in. Thereafter, a period of silence prevailed between Kit–San and H & H. However, during that time Kit–San received results of further testing on November 8, 1984, and February 11, 1985. Brown and Caldwell notified Kit–San on March 22, 1985, of a permitted change order as a result of the latest tests. Kit–San did not reject until 1½ months later. Within this time, both Friendship and H & H had filed actions against Kit–San. The court found that a possible reason for the delay by Kit–San was because the company was waiting to see if it could obtain replacement bentonite from American Colloid.

Because the contract did not specify a time for rejection, the code provision for a reasonable time governed. The goods were not perishable, so no immediate action was necessary. Kit–San did nothing inconsistent with H & H's ownership. According to Hawke's own testimony, it was Kit–San's responsibility to test the product to see if it met requirements. Given Hawke's knowledge of the industry and his company's asserted knowledge of EPA require-

ments and the specifications for the St. Maries project, it is logical to assume it would have reason to know of the type of testing required for the project, including a 200 day permeability test, and that these tests could not be completed overnight. As the court stated:

> When Kit–San ordered the bentonite from H & H, it was patently obvious that the Brown and Caldwell requirements had not been complied with, nor could they be for a period of time. For example, it seems clear that Imus ordered the bentonite without any assurance that the H & H product had been tested for a minimum of 200 days within the preceding 12 months to assure that it met the requirements, and that testing was begun immediately after the first delivery in order to satisfy Brown and Caldwell. Clearly, if the specifications were adhered to, nothing could be done for at least 200 days thereafter.

Moreover, the quality of the bentonite could not be determined without scientific testing and comparison with American Colloid bentonite, given the fact that the project specifications were based on American Colloid and H & H had essentially represented that its product could replace that bentonite directly because it was "as good or better than American Colloid."

Hawke testified that he had not received the project specifications. Still, he submitted to Kit–San results of tests he had previously commissioned on the H & H bentonite, in an attempt to provide Kit–San with "a certified test result" for the St. Maries project. However, Hawke also testified that testing was Kit–San's responsibility. As the court pointed out, H & H's tests did not contain any data for a 200 day permeability test and the bentonite could not be used without that test. Two-hundred days from the first delivery is approximately the time Kit–San rejected. Although Kit–San may have waited until it could find replacement bentonite from American Colloid before rejecting, we do not find this fact dispositive or unreasonable, because testing had continued.

### 2C. Use of Some Bentonite Was Not Acceptance of All

■ The district court found that Kit–San used 34 tons of the total shipment and concluded that this use amounted to an acceptance of all of the goods delivered. The court based its conclusion on the view that the pile of bentonite sitting at St. Maries, consisting of all of the bentonite ordered, was a single commercial unit. We find this conclusion to be contrary to the law.

Acceptance occurs when the buyer accepts any part of a commercial unit. I.C. § 28–2–606(2). However, a party may elect to accept a commercial unit and reject the rest. I.C. § 28–2–601(c); *G & H Land & Cattle, supra.* A commercial unit is defined as:

> a single whole for purposes of sale and division of which materially impairs its character or value on the market or in use. A commercial unit may be a single article (as a machine) or a set of articles (as a suite of furniture or an assortment of sizes) or a quantity (as a bale, gross, or carload) or any other unit treated in use or in the relevant market as a single whole.

I.C. § 28–2–105(6). Regarding partial acceptance, Comment 1 to I.C. § 28–2–601 states that

> A buyer accepting a non-conforming tender is not penalized by the loss of any remedy otherwise open to him. This policy extends to cover and regulate the acceptance of a part of any lot improperly tendered in any case where the price can reasonably be apportioned. Partial acceptance is permitted whether the part of the goods accepted conforms or not. The only limitation on partial acceptance is that good faith and commercial reasonableness must be used to avoid undue impairment of the value of the remaining portion of the goods.... In this respect, the test is not only what unit has been the basis of contract, but whether the partial acceptance produces so materially adverse an effect on the remainder as to constitute bad faith.

*See also Epn–Delaval, S.A. v. Inter-Equip, Inc.,* 542 F.Supp. 238, 34 U.C.C. 130 (S.D.Tex.1982).

■ Here, the basis of the contract was bentonite by the ton. The price of the contract was apportioned on a per ton basis. There is no evidence that Kit–San's use of 34 tons produced an adverse effect on the remainder of the bentonite—except to reduce it—and the quality of the product or its resale value was not impaired. For these reasons, we conclude that Kit–San accepted only the 34 tons it used.

■ Further, a buyer may use goods without accepting them if the use is a reasonable attempt to mitigate damages. 67 AM JUR 2D *Sales* § 635, p. 929. The evidence is undisputed that Kit–San used the 34 tons for testing and in "non-critical" areas as allowed by Brown and Caldwell, after initial notification to H & H that the bentonite did not correspond to representations and after Kit–San had been notified by Budinger that the bentonite did not meet specifications. A use of approximately three and one-half per cent of the whole does not amount to acceptance of the whole in this case. Additionally, a reasonable use of goods for testing to determine if they are conforming is not a use that is inconsistent with the seller's ownership and does not constitute acceptance. 67 AM JUR 2D *Sales* § 634, p. 928.

### 3. Breach of Express Warranty

■ The trial court found that H & H had expressly warranted its bentonite, had breached that warranty, but that the breach was nullified by Kit–San's acceptance of the goods. Although we agree that a warranty existed, we find the court's conclusion regarding acceptance to be erroneous.

In this case, the court properly found that the essential basis of the litigation was Kit–San's "contention that H & H expressly warranted that its bentonite would be equal to or better than the American Colloid product with respect to application rate." Clearly, Kit–San was concerned that the H & H bentonite be of sufficient quality that no more would be required

than had been estimated using American Colloid bentonite as a basis. If the H & H bentonite was of lesser quality, its application rate would be greater and Kit–San would be forced to buy more than contemplated by its contract with the city.

The record indicates that Hawke of H & H had expressed to Imus of Kit–San that the H & H material was as good or better than American Colloid material. As the court found, Hawke's expression amounted to an affirmation of fact relating to the bentonite, became a basis for the bargain, and constituted an express warranty by H & H that its bentonite would be equal in quality to the American Colloid bentonite with respect to permeability. *See* I.C. § 28–2–313. However, it was not equal in quality, as shown by the Budinger tests.

The court also found that because Kit–San did not seasonably reject and had accepted the entire shipment by using 34 tons, the breach of warranty provided no basis for relief. We have concluded that the court erred regarding the seasonableness of the rejection and the use of only some of the bentonite. Thus, we find further error in the court's denial of the breach of express warranty as a basis for recovery. I.C. § 28–2–714(1) (buyer may recover damages for breach in regard to accepted goods); *De Weber v. Bob Rice Ford, Inc.,* 99 Idaho 847, 590 P.2d 103 (1979).

### 4. Breach of Warranty of Fitness for a Particular Purpose

The district court found that no implied warranty of fitness for a particular purpose existed, and thus was not breached. In view of our holding reversing the judgment for other reasons, we decline to address this issue.

### 5. Alleged Contract Between Buyer and Trucker

Our conclusion that their oral agreement constituted the basis of the contract between Kit–San and H & H requires a finding that the trial court erred when it concluded that a contract also existed between

Kit–San and Friendship. The court found that as early as April 25, 1984, H & H advised Kit–San that Kit–San would be paying the freight company directly and could, if possible, negotiate better rates with them. The court also found:

> Friendship Truck considered that it was dealing directly with Kit–San. Despite the fact that Mr. Hawke did, in his October 9, 1984, handwritten letter, quote a price of $80.00 per ton including freight, the tendered formal contract left no doubt that Kit–San would be paying the freight costs directly to Friendship Truck and Kit–San never advised either H & H or Friendship to the contrary. Finally when problems developed concerning the unloading of the bentonite, Kit–San dealt with Friendship Truck and ultimately sent that firm a bill for what it considered to be legitimate reimbursement costs associated with unloading. No such demand was made at the time upon H & H.

The record reveals that H & H contacted Friendship about hauling the bentonite, and Friendship provided a rate to H & H. Mr. Figueroa of Friendship testified that he did not speak with anyone at Kit–San about the trucking and did not have any written contract with Kit–San, but kept in contact with H & H. Friendship's invoices sent to Kit–San indicated that H & H placed the order for shipment. A Mr. Oakes, a former employee of Friendship, testified that he was contacted by Hawke to provide a freight rate Hawke could quote to Kit–San. On the other hand, when Kit–San encountered problems unloading the trucks at the project site, it notified Friendship directly, and went so far as to demand payment for the time and effort spent unloading the trucks.

 We have concluded that the tendered formal contract was not effective as a means of defining the obligations of the parties, but the terms of the prior oral agreement controlled. The oral agreement was that H & H would arrange the shipping and Kit–San would make an undivided payment of $80 a ton to H & H, which would then pay Friendship. Discussions between Kit–San and H & H that Kit–San should pay Friendship directly were merely negotiations. At the most Kit–San agreed to consider such a payment method, but no final agreement was made. Also, the only communications between Friendship and Kit–San occurred when Friendship contacted Kit–San to obtain credit references and later when Kit–San contacted Friendship about its alleged failure to unload the trucks. We find these actions insufficient to establish an agreement between Kit–San and Friendship. Therefore, we find that the district court erred when it concluded that Kit–San was responsible for directly paying Friendship. Under the terms of the oral agreement, Kit–San's payment obligations went only to H & H.

## CONCLUSION

Here, the provisions of the U.C.C. apply to determine that the governing terms between the parties were those of the oral agreement. Kit–San inspected and rejected the goods within a reasonable time, and its use of a small number of commercial units did not constitute an acceptance of every unit. Further, H & H expressly warranted its product to be as good as the product it was replacing, a warranty which was breached when the product was determined to be of lesser quality. We find no contract existed between Kit–San and Friendship. For these reasons, we reverse the judgment of the court and remand for a determination of damages claimed by Kit–San.

 Finally, Kit–San is entitled to an award of attorneys fees against H & H and Friendship Truck Express on appeal pursuant to I.C. § 12–120(3), as the prevailing party in an action based on a contract relating to a sale of goods, together with its costs to be determined under I.A.R. 40 and 41.

SWANSTROM and SILAK, JJ., concur.