597 P.2d 227

STATE of Idaho, Plaintiff-Respondent,

v.

Ila Grace FUCHS, Defendant-Appellant.

No. 12582.

Supreme Court of Idaho.

July 5, 1979.

Bert L. Osborn, of Welch & Osborn, Payette, for defendant-appellant.

Wayne L. Kidwell, Atty. Gen., John Sutton, Asst. Atty. Gen., Boise, for plaintiff-respondent.

SMITH, Justice Pro Tem.

The defendant-appellant in this case was found guilty of having committed the crime of second degree murder after a plea of guilty. She was subsequently sentenced under the indeterminate sentence law of the State of Idaho for a term not to exceed eighteen years. The facts appear from the record and the presentence investigation report. The victim of the homicide in question was Donald Fuchs, the husband of the appellant. The victim and the appellant met in September of 1974, and after a brief courtship, were married in December of 1974. Donald and Ila lived in Garden Valley, Idaho, and in a logging camp at Deadwood for about two months. Donald followed the logging industry. It appears that the marriage was a troubled relationship. According to the appellant, the victim was easily angered and would frequently beat the "daylights" out of her. Donald owned three guns, one of which was a pistol, a .44 Ruger Super Blackhawk magnum revolver, which was the weapon involved in the incident in question.

On Friday before the day of the homicide on October 16, 1976, Donald had to take a truck from Garden Valley, Idaho, to Council, Idaho, for repair. The appellant accompanied him in their 1963 Oldsmobile station wagon. Donald's parents lived at Midvale, Idaho. They stayed at Midvale Friday night with Donald's parents and then on Saturday, took the truck to Council and then came back to Midvale. It was then that Donald and his brother Calvin decided to attend a party that Saturday night in Council where a western music rock festival was going on. The appellant did not really want to go; but she finally decided to go along. The group consisted of Donald, and Ila, the appellant, and Calvin and his wife Nita, and Nita's sister, Judy. Ila took her little puppy along. They arrived at Council around 6:00 p. m., drove by a house that Donald was buying and then went to a restaurant, the Lumberjack, for dinner. They finished dinner around 7:30 or 8:00 p. m., and then they went to the lounge in the Council Hotel where most of the crowd attending the western music rock festival were concentrated. At that point according to Ila in her testimony at the time of sentencing, Donald began to make it clear to her that he did not want her around. He told Ila to take off her rings because he wanted to be with Judy that night. Ila said in testimony that she was relegated to another group of people back by the bar while Donald, Judy, Calvin and Nita stayed up near the band. At one time, Donald apparently came to Ila and told her to quit acting like a fool and to come sit with them. Ila replied that if he wanted to be with Judy to go ahead and be with her—that she could have fun by herself. So Ila sat in her group by the bar and consumed perhaps four or more drinks of blackberry brandy and coke. A blood alcohol test made about one hour after the homicide revealed that the defendant had a .10 percent of alcohol in her blood. Defense counsel at the time of sentencing also stated that it appeared from the transcript of the preliminary hearing that the defendant had taken a tranquilizer, Librium, four or five hours prior to the homicide. As Ila sat there drinking and

talking with her friends, she began to become angry at both Donald and Judy.

At one point, Judy came over, grabbed Ila and physically jerked her outside. In the ensuing struggle, Ila fell and struck her head. She was picked up and placed across the trunk of a car and later, a police patrol car came up and officers took Ila to the police station. She was there perhaps a half hour drinking a coke and composing herself. Then the police let Ila leave. She went back to the lounge to obtain her purse from the table. Then she went to their car to let her puppy out. Ila claimed Donald would not let her have the keys so after several other attempts at entry, she finally broke a window wing with a rock and entered the car. She was seen attempting entry by the police who did nothing, knowing it was her car. At that time, she also removed the .44 magnum from the car. Ila then went to the Council Cafe with her puppy, and there saw one of the women with whom she had been sitting in the lounge. Ila asked her friend to hold the puppy and then said something to the effect that "he is just not worth it." Then Ila left the cafe and went into the lounge. She returned some ten or fifteen minutes later upset and crying and disheveled, her glasses broken. Ila came to her friend, dropped down upon her knees, put her head in the lap of her girl friend and said "I shot him" and "I killed him." Subsequently, Ila left with her friends for the sheriff's office to turn herself in.

During the questioning of Ila at the time of her guilty plea and hearing in mitigation of punishment, it appeared that she could give no details of the actual shooting. However, the presentence investigation report reveals that the shooting occurred in the Council Lounge in the Council Hotel which is located on Main Street in Council, Idaho. The record of postmortem examination disclosed that the deceased was shot in the left back below the shoulder. The bullet passed through the left scapula then through the fourth and fifth ribs which were explosively shattered, then through the left upper lobe, then completely disrupted and separated the aorta. The bullet lodged near the deceased's right shoulder. It appears that Ila had fired only one shot. It is clear from the record that at the time of the shooting, which was around 11:30 p. m., the Council Lounge was crowded with revelers in attendance for the evening's festivities.

The investigation and the events following the incident resulted in a charge or murder in the first degree being lodged against the appellant. At arraignment, she filed notice of intent to rely on the defense of not guilty by reason of mental disease or defect and a psychiatric examination was ordered by the court. However, this examination never took place. According to her defense counsel's statement in open court on January 31, 1977, Ila had decided she did not want to be involved in any psychiatric procedure. On that date, as a result of a plea bargain, the state filed an amended information charging murder in the second degree. The insanity plea was withdrawn and the defendant entered a plea of guilty to the charge of murder in the second degree which the court accepted.

The court ordered a presentence investigation; and on March 5, 1977, held a lengthy hearing in mitigation and aggravation before passing sentence. It appears from the transcript of this hearing and the presentence investigation report that, at the time of sentencing, Ila was a young woman of about 24 years of age who had lived a hard life. At one time a few years prior to the incident, she testified she had been involved with drugs—"marijuana, speed, uppers, downers and finally acid." Ila's mother testified that as Ila entered high school, her father had a heart attack and her mother had to work. Ila at that time started skipping school. While in the eleventh grade, she ran away from home twice. She ultimately quit school that year after she had been a runaway for two weeks. Later in August, 1970, Ila married one Wayne Reed. They remained married about two and one half years, and then were divorced. During that marriage Ila was the victim of physical assaults from time to time. Ila apparently had one child, and then Reed

disappeared when Ila became pregnant with the second child. After that, Ila lived with one Jim Turnbull for about a year, but they were never married. He apparently helped Ila get off drugs. After that, she lived with another man in Emmett for about three months. Ila's ex-in-laws during these times were giving her problems about the custody of her children so she arranged to have her own parents adopt her children. Then she married Donald in December 1974.

The evidence at the mitigation hearing also indicated one or two attempts by Ila at suicide in 1975 after she was married to Donald.

In the light of these facts, Judge Norris sentenced Ila to eighteen years, considering that she would be eligible for parole in six years. The prosecution had urged a sentence of thirty years. The defense had urged the minimum sentence of ten years.

On this appeal, the appellant has alleged two assignments of error: that the trial court abused its discretion by sentencing the defendant to an indeterminate period of time not to exceed eighteen years; and that the trial court erred by not requiring a mental evaluation to insure that the defendant was mentally competent to waive her constitutional rights at the time she entered her plea of guilty to the charge of second degree murder.

On the contention that the trial judge abused its discretion by sentencing the defendant to an indeterminate period of time not to exceed eighteen years, the defendant argues that the Supreme Court has the power to reduce excessive sentences where it appears that the trial court has clearly abused its discretion. Counsel for the defendant cites *State v. McClellan*, 96 Idaho 569, 532 P.2d 574 (1975), for the proposition that evidence of no prior felony convictions on the part of the defendant militates against a long sentence for second degree murder. Therefore, the defense argues that the trial court abused its discretion by not imposing the minimum sentence, 10 years, because the defendant had never been convicted of a felony and the deceased had beaten defendant in the past and shunned her for other women.

The respondent argues that the defendant's sentence is well within the statutory limits set out by the legislature for punishment of second degree murder, and that there was no abuse of discretion by the trial court.

■ The statutory limits of punishment for second degree murder are 10 years to life. I.C. § 18–4004. However, this Court has repeatedly held that, in the absence of an abuse of discretion, the authority to fix the maximum sentence resides with the trial judge, and such sentence will not be disturbed if the sentence is within the statutory limits. *State v. Ward*, 98 Idaho 571, 569 P.2d 916 (1977); *State v. Gomez*, 94 Idaho 323, 487 P.2d 686 (1971); *State v. Dunn*, 91 Idaho 870, 434 P.2d 88 (1967); *King v. State*, 91 Idaho 97, 416 P.2d 44 (1966); *State v. Gish*, 89 Idaho 334, 404 P.2d 595 (1965). The Idaho Supreme Court has upheld the following sentences as not being excessive for second degree murder: life imprisonment, *State v. Ward, supra*; 30 years, *State v. Beason*, 95 Idaho 267, 506 P.2d 1340 (1973); "not more than 21 years," *State v. Gomez, supra*; sixty years, *King v. State, supra*.

■ In fixing sentence, the trial court should consider the previous character of the defendant, both good and bad. In defendant's favor there are a number of factors that would indicate some leniency in sentencing would be in order. This is her first felony conviction. She turned herself in to the sheriff immediately after the murder. At the time of the murder, she showed remorse for the crime she committed. When she was arrested she had a .10 percent blood alcohol level. She apparently had some reason to fear brutality from her husband.

On the other hand, the record and presentence investigation report show the defendant to be a person with an unstable personality and life style; she is a person who cannot control her jealous impulses to a point where she would commit murder. Such a person must be regarded as danger-

ous. The few factors in mitigation noted in appellant's brief when weighed with other information in the record do not indicate that the trial court erred or abused its discretion in sentencing the defendant to eighteen years, a period well within the statutory maximum. Also, Ila was sentenced under the indeterminate sentence law to a period of time "not to exceed eighteen years." She will be eligible for parole in six years. I.C. § 20–223.

Before sentencing, the trial judge listened to the arguments of both counsel and considered all of the factors in mitigation. He heard mitigation evidence and read a presentence investigation report. There was no allegation of prejudice on the part of the trial court; nor does the record indicate any prejudice. The judge did not abuse his discretion in this case.

Going now to the next assignment of error, appellant argues that both state law and federal constitutional law require that the trial court make a specific finding that the defendant was competent to waive her constitutional protections before accepting a guilty plea. Appellant argues that I.C. § 18–212 (which states that when a defendant's fitness to proceed is drawn into question, the issue shall be determined by the court) requires a specific determination of competency. Appellant believes that the defendant's competence was drawn into question when the defendant originally served notice of an intent to rely on the defense of insanity. Appellant believes that the district court's questioning of defendant at the hearing was a mere attempt to determine voluntariness, and that the judge failed to show the defendant was competent to plead guilty. Therefore, the question is whether defendant's sanity was "in issue" within the meaning of the statute when the defendant gave notice that she planned to rely on the defense of insanity, but later withdrew that defense.

The State argues that defendant, by declining to go through a psychiatric examination, removed from consideration the question of appellant's competency. The State contends that this refusal and Ila's failure to develop the affirmative defense of insanity resulted in the defendant vouching for her sanity at the time of the offense, at the time of the trial, and at any time appellant elected to waive constitutionally protected rights. The State makes the point that under Idaho law the defendant has the burden of raising the issue of insanity, or put another way, of "putting in issue" the defendant's sanity. *State v. Myers*, 94 Idaho 570, 494 P.2d 574 (1972). Insanity is an affirmative defense in Idaho and this Court has held that until the defendant puts sanity in issue, the prosecution has no burden whatsoever. Furthermore, this Court has consistently held that the defendant's plea of insanity is ineffectual until backed up by proof that creates a reasonable doubt as to the sanity of the accused. *State v. Myers, supra; State v. Clokey*, 83 Idaho 322, 364 P.2d 159 (1961).

■■ Numerous cases and statutes say in effect that in certain situations presumptions of guilt arise, thereby forcing a defendant to submit proof sufficient to raise a reasonable doubt as to his guilt. These laws have recently been scrutinized and are not favored by the courts. *See State v. Trowbridge*, 97 Idaho 93, 540 P.2d 278 (1975); *State v. Wagenius*, 99 Idaho 273, 581 P.2d 319 (1978). Such questions are not involved in the case at bar. Whatever influence these cases might have on a defendant's burden of proof of "not guilty by reason of mental disease or defect" will have to be considered on a later day. Notwithstanding, we can still say at least that the insanity defense as an affirmative defense calls for the defendant to do something more than merely filing a pleading. *See generally:* Annot., 17 A.L.R.3d 146 (1968). Until that is accomplished, the prosecution may rest on the legal presumption that all persons are sane and responsible for their acts. *State v. Iverson*, 77 Idaho 103, 289 P.2d 603 (1955); *State v. Thorp*, 48 Idaho 636, 284 P. 201 (1930); *State v. Shuff*, 9 Idaho 115, 72 P. 664 (1903).

■ In this case, defendant withdrew the defense of insanity, and pleaded guilty to second degree murder. Therefore, neither

the sanity of the defendant at the time of the murder nor her competency to stand trial or assist in her defense was raised at the trial court level.

■ While it is clear in this case that the matter of defendant's competency to stand trial or to plead guilty was not procedurally in issue at the time of the guilty plea, this is not the only consideration. The appellant's appeal by inference also raises the question as to what responsibilities are imposed upon the trial court judge to evaluate a defendant's competency to plead guilty when the defendant's competency has not been put in issue. The trial court judge must always be on guard to make certain that there is no violation of federal Fourteenth Amendment due process in any action in criminal court. *Westbrook v. Arizona,* 384 U.S. 150, 86 S.Ct. 1320, 16 L.Ed.2d 429 (1966); *Carnley v. Cochran,* 369 U.S. 506, 82 S.Ct. 884, 8 L.Ed.2d 70 (1962); *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938).

■ It is of course fundamental that a defendant in a criminal trial cannot abandon any constitutional protection except by an intelligent and competent waiver. *Westbrook v. Arizona, supra; Johnson v. Zerbst, supra; Sieling v. Eyman,* 478 F.2d 211 (9th Cir. 1973).

In *Sieling v. Eyman, supra,* the U.S. Ninth Circuit Court of Appeals had occasion to analyze and comment upon the duties of the trial court judge to determine the competency of the defendant to plead guilty. The opinion in *Sieling* written by former Idaho State District Court Judge Oliver Koelsch approved this standard as to competence:

"A defendant is not competent to plead guilty if a mental illness has substantially impaired his ability to make a reasoned choice among the alternatives presented to him and to understand the nature of the consequences of his plea." *Id.* at 215, *quoting Schoeller v. Dunbar,* 423 F.2d 1183, 1194 (9th Cir. 1970) (Hufstedler, J., dissenting.)

Consistent with this test, the court also stated that trial courts should "assess a defendant's competency with specific reference to the gravity of the decisions with which the defendant is faced." *Sieling v. Eyman, supra* at 215. One could hardly quarrel with such a standard.

*Sieling* also categorized broadly the kinds of mental capacity situations which confront trial courts on guilty pleas. *Sieling* noted that in the typical case where the sanity or mental capacity of the defendant has *not* been put in issue, the validity of the defendant's waiver of rights upon his plea of guilty can be assessed by the trial court under the assumption that the defendant is capable of making the weighty decisions involved in giving up his rights to counsel, cross-examination, trial by jury, or his privilege against self-incrimination. On the other hand, when the defendant's sanity or competency has been put into issue or "lurks in the background," it is logically inconsistent to suggest that a defendant's waiver of rights can be examined only by reference to those same criteria where the defendant is presumed competent.

■ So, at the two extremes, the duties of the trial judge are easily ascertained, i. e., where the competency question has not been raised, the trial judge has no duty to independently inquire as to the competency of the defendant. The opposite is true when the sanity issue has been raised—the judge must conduct a hearing to inquire as to the defendant's capacity before accepting a guilty plea. *Pate v. Robinson,* 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966).

The trial judge encounters problems when the issue of mental capacity has not been raised, and yet a question of competency lurks in the background. The court in *Sieling* did not deal with this question except to suggest that it would arise where a "substantial question of a defendant's mental capacity has arisen." *Sieling v. Eyman, supra* at 214. Four years later, the Ninth Circuit Court of Appeals clarified this statement in *Sailer v. Gunn,* 548 F.2d 271 (9th Cir. 1977). In that case the Court held that under the due process clause a hearing on a defendant's competence to plead guilty is required if the trial judge

entertains or should have reasonably entertained a good-faith doubt as to the competence of the defendant to understand the nature and consequences of his plea or to participate intelligently in the proceedings including his ability to make a reasoned choice among alternatives presented to him.

We now turn to a brief description of the defendant's background and the sentencing hearing to determine if the evidence was such that the district court judge should have entertained a good-faith or bona fide doubt as to the competence of the defendant.

Defendant's unstable background was alluded to earlier in the opinion. She started skipping school in the eleventh grade after her father died, and shortly thereafter she quit school and got married. By her own admission she was at one time heavily involved with drugs. She had one child by her previous husband; but that marriage ended when her husband abandoned her when she was pregnant with her second child. She lived with two different men before getting married a second time to the decedent. She had attempted suicide twice since her second marriage.

The presentence investigation specialist found the subject "well-oriented," courteous, and cooperative, though she considered herself a loner.

During the hearing in which she withdrew her insanity defense, the court addressed her, asked her if she understood the proceedings and the implication of withdrawing that defense. The court also asked her if the had discussed the consequences of this with her counsel; and if she was satisfied with her counsel. At that time, the court told her of the possible sentence and explained the constitutional rights she was relinquishing by pleading guilty. During the proceeding appellant was alert and responsive to the judge's questions.

During the sentencing, Ila showed remorse for having murdered her husband. She stated she realized she had taken a life and was willing to pay for it with part of her own. It is true that defendant claims to have blacked out the details of the incident and that some of her responses demonstrate a slight paranoia. Her courtroom demeanor was beyond reproach during all the proceedings. At all times she was assisted by counsel, and her attorney apparently believed his client was competent to plead guilty as he never raised the issue. During the sentencing, she appeared to be quite capable of understanding the proceedings and of making a rational choice among the alternatives. This is certainly not similar to either the situation in *Pate* or *Sieling*. In *Pate* the defendant had a long history of pronounced irrational behavior. In *Sieling*, a substantial question had arisen as to defendant's capacity, and three psychiatrists had agreed he was insane at the time he committed the crime.

On the basis of the evidence before the trial judge, we are of the opinion that the mental capacity of Ila Fuchs was not placed in question. There was some evidence of emotional problems, but certainly nothing to put the trial judge on notice or raise a bona fide doubt as to her competence to make a reasoned choice among the alternatives when she made her guilty plea. The trial judge acted properly in proceeding upon the assumption that Ila was mentally capable of making the weighty decisions involved in pleading guilty and in waiving her constitutional defenses.

Judgment affirmed.

BAKES and BISTLINE, JJ., and SCHROEDER, J., Pro Tem., concur.

SHEPARD, Chief Justice, specially concurring.

I concur in the result obtained in the majority opinion and in much of the analysis and language contained therein. Although not explicitly stated in the majority opinion, there appears to be the implication that *Sieling v. Eyman*, 478 F.2d 211 (9th Cir. 1973), and *Sailer v. Gunn*, 548 F.2d 271 (9th Cir. 1977), are somehow binding and conclusive on this Court. My view is otherwise. To the extent that such decisions are well reasoned, they may be persuasive. As is well stated in the majority opinion, a

348

defendant is presumed to be mentally competent and a defense of mental incompetence is an affirmative defense and its assertion requires a defendant to do more than merely file a pleading. To the extent that the language of the majority opinion, in its discussion of *Sieling* and *Sailer* may modify that rule, I disagree. To the extent that additional duties are to be placed upon a trial judge in situations such as the case at bar, I disagree. Here the defendant was represented by counsel and no criticism of counsel's competence is made or even implied. Psychiatric evaluation was offered and rejected by the defendant. I suggest that the language of the majority to the effect that a competency question "lurks in the background" somehow puts in issue the competence of a defendant in contradiction to the usual presumption.