**IN THE COURT OF APPEALS OF THE STATE OF IDAHO**

**Docket No. 35281**

| | | |
|---|---|---|
| STATE OF IDAHO, | ) | 2009 Opinion No. 79 |
| | ) | |
| Plaintiff-Respondent, | ) | Filed: December 30, 2009 |
| | ) | |
| v. | ) | Stephen W. Kenyon, Clerk |
| | ) | |
| FARON RAYMOND HAWKINS, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

Appeal from the District Court of the Fourth Judicial District, State of Idaho, Ada County. Hon. Michael R. McLaughlin, District Judge.

Judgment of conviction for robbery, vacated and case remanded.

Nevin, Benjamin, McKay & Bartlett; Dennis A. Benjamin; Deborah A. Whipple, Boise, for appellant. Dennis A. Benjamin argued.

Hon. Lawrence G. Wasden, Attorney General; Lori A. Fleming, Deputy Attorney General, Boise, for respondent. Lori A. Fleming argued.

_____

WALTERS, Judge Pro Tem

Faron Raymond Hawkins appeals from his judgment of conviction for robbery. Specifically, Hawkins argues that the district court's failure to *sua sponte* order a psychiatric evaluation and conduct a hearing to determine his competence to stand trial was an abuse of its discretion. For the reasons set forth below, we vacate the judgment of conviction and remand the case for further proceedings.

**I.**

**BACKGROUND**

On December 15, 2005, Hawkins contacted retired Federal Bureau of Investigation (FBI) agent George Calley and expressed concerns about the safety of his sons who were incarcerated in Colorado for bank robbery. Calley was familiar with Hawkins and told Hawkins that he could not protect the boys but that he could put Hawkins in contact with a current agent of the FBI in Boise. Hawkins told Calley that he wanted to work with the FBI and that he had been working

1

with an assistant United States Attorney in Portland, Oregon. The next day, December 16, 2005, Hawkins robbed a Key Bank in Boise by presenting a note that demanded $15,000 and threatened to shoot people if his demands were not met or if anyone tried to follow him. Photos of the robber were made by a security camera in the bank. Following the robbery, a teller at the bank identified Hawkins in a photographic line-up, but police were unable to locate Hawkins. After hearing and seeing news reports on the bank robbery, Calley informed law enforcement of his conversation with Hawkins and that he suspected Hawkins was the perpetrator. A few days later, Hawkins left a message on Calley's answering machine. Essentially, Hawkins said that since he had not heard from Calley, he assumed that Calley could not help him. Calley tried to call and email Hawkins back but his attempts to reach Hawkins were unsuccessful.

Several months later, on June 6, 2006, Hawkins robbed a Washington Mutual Bank in Boise in the same manner as he had done in the Key Bank robbery, by presenting a note demanding $15,000 and threatening to shoot people. Again, a surveillance camera photographed the robber. As he was leaving with the money, Hawkins turned to the tellers and said, "By the way, my name is Faron Hawkins, and this is all because of George Calley." Hawkins called Calley a few days later and told him that he had used Calley's name in the bank robbery. Calley offered to help Hawkins find an attorney, but Hawkins did not respond to Calley's offer and terminated the conversation.

On August 10, 2006, law enforcement located Hawkins at a campground near The Dalles, Oregon, where he was staying with his wife and children in a camp trailer. When an officer attempted to make contact with Hawkins at the camp trailer, Hawkins pointed a loaded gun at the officer. The officer retreated and, after the campground was evacuated, law enforcement officers surrounded the trailer and ordered Hawkins to come out. An eight-hour standoff ensued during which Hawkins fired a gun in the direction of the officers, but eventually allowed his wife and children to leave the trailer. Hawkins was finally taken into custody after the officers shot tear gas into the trailer, forcing Hawkins to come out.

When interviewed by Oregon police, Hawkins stated that he had been a Central Intelligence Agency (CIA) operative, had knowledge of transportation of weapons to Canada, had been involved in a South American operation with a National Security Agency (NSA) advisor and, at some point, had cut a transponder out of his earlobe that had been placed there by

2

"someone."[1]  Hawkins also claimed to be a sophisticated criminal and freely admitted that he had committed the December 16, 2005, Boise bank robbery.  A warrant to search Hawkins' van, pickup, and camp trailer was obtained and executed.  During the search, several items of clothing that matched the description of items used during the Boise bank robberies, together with a checkbook containing one of the robber's demand notes, were seized.  When Hawkins was interviewed by an FBI agent he stated that his wife and stepson liked to spend money, and that his wife encouraged his stepson to rob banks to get more money.  He also stated that he and his wife helped his stepson rob banks by monitoring police scanners, and that he had suggested to his stepson that he should rob banks by using a demand note.  However, in subsequent interviews with the FBI agent, Hawkins stated that he and his stepson were forced to commit the robberies.  Hawkins claimed that the men who forced him to rob the banks threatened his wife and children.  He also claimed that the men put a bomb vest on him and threatened to detonate it if he did not rob the Key Bank, and again put a bomb vest on him and forced him to wear an earpiece when he robbed the Washington Mutual Bank.

A grand jury indicted Hawkins on two counts of robbery.  Hawkins moved to proceed *pro se*, and after an extensive *Faretta*[2] inquiry, the district court granted Hawkins' request for self-representation but also appointed a public defender as standby counsel.  Later, Hawkins again requested that counsel be reappointed and the court granted his request.  After that appointment, Hawkins changed his mind and again moved to proceed *pro se*.  The court conducted another *Faretta* inquiry, granted the motion, and appointed the public defender as standby counsel.  On January 7, 2008, trial commenced and Hawkins testified on his own behalf.  He admitted to the bank robberies, but claimed that they were done under duress.  Hawkins stated that the people who forced him to commit the robberies did so by making threats to him, to his wife, and to his children.  Ultimately, the jury found Hawkins guilty of the robberies.

Hawkins filed a motion for new trial and then moved for reappointment of counsel, and the court granted this request.  A few minutes later, Hawkins' counsel advised the court that Hawkins was dissatisfied with counsel's performance because counsel did not believe there was

---

[1]  In a subsequent interview, Hawkins admitted that he was not sure if everything he told the detectives about his CIA involvement was true.

[2]  *Faretta v. California*, 422 U.S. 806 (1975).

any basis to move for a mistrial or for a new trial. Hawkins requested that he be allowed to continue to *pro se* argue his motions. The district court noted that Hawkins had filed a motion to "dismiss on the grounds of mental incapacity" claiming that the state's evidence showed that he was delusional. The district court denied the motion to dismiss but, based on Hawkins' claim of mental incapacity, ordered a psychological evaluation pursuant to Idaho Code § 19-2522 for purposes of sentencing. The court also declined Hawkins' motion to proceed *pro se,* noting that "if Mr. Hawkins is contending that he is delusional, I don't think his decision whether to hire or not keep an attorney, at this point, is appropriate."

At a subsequent hearing, the district court set forth for the record that it had never had cause to believe that Hawkins lacked the mental capacity to understand the proceedings or to assist in his own defense. The court noted that it had ordered the psychological evaluation for sentencing purposes "in an abundance of caution" based on the assertions made by Hawkins in his motion to dismiss that had been filed shortly after the jury had reached its verdicts. The court further noted that Hawkins had failed to participate in the psychological evaluation and, after questioning Hawkins, the court determined that Hawkins was asserting his Fifth Amendment rights not to participate in such an evaluation. At Hawkins' request, the court ordered the public defender to continue to represent Hawkins and set the case over for hearing on the multiple post-trial motions that Hawkins had filed *pro se*. At the subsequent motion hearing, Hawkins' counsel advised Hawkins and the court that, if asked to argue Hawkins' post-trial motions, his position would be that the motions had no merit. Based on counsel's representation, the court permitted Hawkins to argue his motions *pro se,* finding once again that Hawkins was competent to waive counsel and that he did so freely and voluntarily. Following argument, the district court denied Hawkins' motions.

The case proceeded to a sentencing hearing, at which Hawkins was represented by the public defender. The district court imposed concurrent unified sentences of life with thirty years fixed. Hawkins timely appealed.

## II.

## DISCUSSION

Hawkins contends that the failure of the district court to *sua sponte* order a psychiatric evaluation and to conduct a hearing to determine his competence to stand trial was an abuse of its discretion. The decision whether reasonable grounds exist to order a psychological or

psychiatric evaluation to determine a defendant's competence to stand trial is left to the trial court's discretion. *State v. Longoria*, 133 Idaho 819, 822, 992 P.2d 1219, 1222 (Ct. App. 1999); *State v. Potter*, 109 Idaho 967, 969, 712 P.2d 668, 670 (Ct. App. 1985), (citing with approval *State v. Roper*, 140 Ariz. 459, 682 P.2d 464, 468 (App. 1984)) ("The trial court has broad discretion on determining if reasonable grounds exist [to question a defendant's competency], and unless there has been manifest abuse in this discretion, the trial court will be upheld."). Absent a clear abuse of discretion, the trial court's decision not to order a mental evaluation will be upheld on appeal. *Longoria*, 133 Idaho at 822, 992 P.2d at 1222. When a trial court's discretionary decision is reviewed on appeal, the appellate court conducts a multi-tiered inquiry to determine: (1) whether the lower court correctly perceived the issue as one of discretion; (2) whether the lower court acted within the boundaries of such discretion and consistently with any legal standards applicable to the specific choices before it; and (3) whether the court reached its decision by an exercise of reason. *State v. Hedger*, 115 Idaho 598, 600, 768 P.2d 1331, 1333 (1989). On appeal, we examine whether there was sufficient, competent, even if conflicting, evidence to support the district court's determination of competency. *State v. Lovelace*, 140 Idaho 53, 63, 90 P.3d 278, 288 (2003); *State v. Daniel*, 127 Idaho 801, 803, 907 P.2d 119, 121 (Ct. App. 1995). Unless the lower court's finding was clearly erroneous, we will affirm. *Daniel*, 127 Idaho at 803, 907 P.2d at 121.

Idaho Code §§ 18-210 and 18-211 provide guidance on when a defendant may be tried and when a mental evaluation is required. Idaho Code § 18-210 provides that:

> No person who as a result of mental disease or defect lacks capacity to understand the proceedings against him or to assist in his own defense shall be tried, convicted, sentenced or punished for the commission of an offense so long as such incapacity endures.

Further, the standard to be met before a mental evaluation of a defendant is required is set forth in Idaho Code § 18-211:

> Whenever there is reason to doubt the defendant's fitness to proceed as set forth in section 18-210, Idaho Code, the court shall appoint at least one (1) qualified psychiatrist or licensed psychologist or shall request the director of the department of health and welfare to designate at least one (1) qualified psychiatrist or licensed psychologist to examine and report upon the mental condition of the defendant to assist counsel with defense or understand the proceedings.

5

A trial court ordinarily has no duty to independently inquire as to the competency of a defendant unless the defendant raises the issue by motion or by presenting evidence showing lack of competency. *State v. Fuchs*, 100 Idaho 341, 346, 597 P.2d 227, 232 (1979); *State v. Hayes*, 138 Idaho 761, 764, 69 P.3d 181, 184 (Ct. App. 2003). When the defendant's competency has not been explicitly raised as an issue, the trial court must *sua sponte* inquire as to the defendant's competency only if the court entertains or reasonably should entertain a good faith doubt as to the capacity of the defendant to understand the nature and consequences of the plea. *Fuchs*, 100 Idaho at 346-47, 597 P.2d 232-33; *Hayes*, 138 Idaho at 764, 69 P.3d at 184. The test to determine whether a criminal defendant is competent to stand trial is whether the defendant has a rational as well as factual understanding of the proceedings against him and whether the defendant has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding to assist in preparing his defense. *Dusky v. United States*, 362 U.S. 402 (1960) (holding petitioner had an intellectual understanding of the charges against him but his impaired sense of reality substantially undermined his judgment and prevented him from cooperating rationally with his lawyer); *Stone v. State*, 132 Idaho 490, 492, 975 P.2d 223, 225 (Ct. App. 1999).

A trial judge must conduct a competency hearing, regardless of whether one is requested, whenever the evidence before the judge raises a bona fide doubt about the defendant's competence to stand trial. A bona fide doubt exists if there is substantial evidence of incompetence. *Williams v. Woodford*, 384 F.3d 567, 603-04 (9th Cir. 2004). Although no particular facts signal a defendant's incompetence, suggestive evidence includes the defendant's demeanor before the trial judge, irrational behavior of the defendant, and available medical evaluations of the defendant's competence to stand trial. *Drope v. Missouri*, 420 U.S. 162, 180 (1975). A bona fide doubt existed when the defendant exhibited bizarre behavior and beliefs in his pre-arrest correspondence with the government, in his post-arrest statements, and when before the court. *United States v. Auen*, 846 F.2d 872, 878 (2nd Cir. 1988).

An individual can have the capacity to understand the proceedings but lack a rational understanding, thereby resulting in incompetence. *Lafferty v. Cook*, 949 F.2d 1546 (10th Cir. 1991). In *Lafferty*, the defendant was oriented in time and place and aware of the nature of the court proceedings, but was also paranoid and delusional. He believed that during a religious revelation he was instructed to "remove" his sister-in-law, her infant child, and two other people.

6

The appellate Court determined that although the defendant's behavior at trial was logical and consistent, the trial court erred in finding him competent to be tried for murder given his delusional thinking. *Id.* at 1555. The Court further noted that "[a]lthough the facts in each case vary, the circuits addressing competency after *Dusky*, including our own, have used a sufficient contact with reality as the touchstone for ascertaining the existence of a rational understanding." *Id.* at 1551.

The United States Supreme Court recently recognized that the test to determine whether a defendant is competent to stand trial on criminal charges while represented by an attorney is different from the test to determine whether the defendant lacks the mental capacity to conduct his defense without the assistance of counsel. In *Indiana v. Edwards*, ____ U.S. _____, 128 S. Ct. 2379 (2008), the Court held that the Constitution does not forbid a state from insisting upon representation by counsel for those competent enough to stand trial but who suffer from mental illness to the point where they are not competent to conduct trial proceedings by themselves. Indeed, appointment of standby counsel over a self-represented defendant's objection is permissible, where the defendant is competent to stand trial. *McKaskle v. Wiggins*, 465 U.S. 168, 178-79 (1984). Our attention in this case, therefore, is upon whether in the course of Hawkins' self-representation, the district court should have considered *sua sponte* whether Hawkins was competent to undergo trial, and if so, whether Hawkins was rational enough to represent himself rather than be represented by counsel.

Hawkins asserts that, in view of the indicia that he was not in touch with reality, it was an abuse of discretion and a violation of his due process rights when the district court did not *sua sponte* order an evaluation to determine his competency to stand trial and to waive his right to counsel and represent himself. Specifically, Hawkins argues that the district court should have entertained a genuine doubt as to his competency to stand trial based on giving his own name and linking George Calley to the second robbery, his statements to law enforcement about his alleged involvement with the CIA, his claimed head injury, his reference in a motion to a gag order allegedly issued by an Oregon judge, his requests to subpoena certain national security officials as trial witnesses, and his unusual behavior in general.

There is no question that Hawkins was capable of preparing and arguing his own defense, largely without the help of standby counsel. The record reflects that throughout the pretrial and trial process Hawkins was alert and coherent, he understood the order of events, and he was an

7

active participant. He filed numerous *pro se* motions. He gave an opening statement, cross-examined the state's witnesses with the help of standby counsel, and questioned defense witnesses. However, even though Hawkins had the ability to prepare and argue his own defense, he also exhibited delusional characteristics during pretrial and trial, which indicate that he might have been out of touch with reality and did not have a rational understanding of the proceedings.

Hawkins exhibited many bizarre behaviors during the pretrial and trial process, all of which should have raised a bona fide doubt as to his competency. Hawkins filed a motion seeking CIA, NSA and Air Force documents and files, demonstrating some initial odd behavior. When Hawkins informed the district court that he still needed discovery, the court acknowledged that it had read the discovery provided to him, meaning at this point the court was aware of the statements Hawkins made to police at the time of his arrest about his duress defense and the fact that he identified himself at one of the robberies. Hawkins filed a motion to vacate a trial setting in which he asked the court to consider his medical condition citing a head injury received while in the jail and information obtained from testing at St. Alphonsus Regional Medical Center and St. Luke's Regional Medical Center after the injury. The district court should have taken this into consideration, especially since Hawkins was taken to two different hospitals for testing. In a motion to remove counsel and to suppress evidence, Hawkins referred to a gag order allegedly issued by an Oregon judge.[3] At a pretrial hearing on a motion to quash subpoenas and to compel attendance of witnesses, Hawkins made claims regarding his need to subpoena certain named individuals who were businessmen in Boise who he alleged had sent persons to threaten him and made him commit the robberies. Hawkins also informed the court, in camera, of his intent to use duress as a defense, as well as the identity of a CIA operative who forced him to wear a bomb vest and threatened to kill him if he did not rob the banks. All of these events happened before the trial started, and they should have put the district court on notice that Hawkins was not

---

[3] Hawkins represented that the district attorney in Oregon had obtained a "gag" order that precluded anyone from talking to Hawkins, but that Hawkins subsequently responded to interviews by FBI, Oregon law enforcement officers and by Boise police personnel. He essentially claimed that any statements he made to any investigator should be suppressed as a violation of the gag order. It did not appear, however, that the interviewing officers were aware of any order prohibiting the interviews when Hawkins talked to them. No order from any Oregon judge was introduced in the proceedings.

completely rational or in touch with reality. The very last thing that should have raised a red flag with the district court was the unusual behavior that Hawkins displayed at trial before the jury.

Hawkins testified at his trial. Because he was representing himself, he would ask a question, and then answer it. He related the following events. Hawkins testified that he had been involved with the CIA since 1978.[4] He told an officer after his arrest that he had received training in the CIA at "the Farm" located in Langley, Virginia, and had cut a transponder out of his earlobe. He said that although he had received some training by the CIA, he was never under the direct care and control of the CIA, but worked with "proprietaries." He stated that he had worked with a named, well-known businessman in Boise to conduct wiretapping and investigation of certain employees of the Simplot Company, and that he had done wiretapping in relation to the CIA at Bechtel Corporation and Morrison-Knudsen Company.

Hawkins said that he was telephoned on December 16, 2005, and instructed to meet a man named Robert Kenneth Dugan at a location a few miles east of Boise described as the "Corpus Christi" site. When he got there, Dugan and three other men named Nigel Winters, Ken and Mike, were present as were Hawkins' wife and children. He said the men were upset with Hawkins regarding his loss of the shipment of a guidance chip for a Patriot missile. Dugan and the others told Hawkins that they were going to put a bomb vest on Hawkins and have some fun. Hawkins knew the vest was real because he had seen one before and had seen one detonated when these people had put such a vest on a man and placed him in a row boat and then using a proximity detonator, killed him. Hawkins described the vest as containing explosive bentonite.[5] After Hawkins was outfitted with the vest, he was told that he was going to be

---

[4]    Hawkins was fifty years old at the time of trial in January, 2008, so he would have been about twenty years old in 1978. In 1978, Hawkins was convicted of robbing a bank in Horseshoe Bend, Idaho. He was also convicted in Oregon in the 1980s of robbery, burglary and escape.

[5]    A witness for the state on rebuttal testified that bentonite was a form of clay used in well-drilling operations because it swells up when it gets wet and can be used to help plug wells. For further information *see Figueroa v. Kit-San Co.*, 123 Idaho 149, 845 P.2d 567 (Ct. App. 1992), (bentonite is a type of porous clay soil which occurs naturally in Wyoming and Utah and is commonly used for a lining in the construction of sewage lagoons because it swells when exposed to water and makes a good natural sealant). *See also Leydet v. City of Mountain Home,* 119 Idaho 1041, 812 P.2d 755 (Ct. App. 1991).

punished for not doing what was expected of him (evidently resulting from the lost "shipment"). The punishment was to be that Hawkins would be forced to rob a bank. He was told by Dugan that if he did not complete the robbery, the vest would be detonated and the men would "have some fun" with Hawkins' wife. Dugan and Hawkins returned to Boise in Hawkins' van and Dugan got out of the car after giving Hawkins his instructions. Hawkins drove to the Key Bank in Boise, put on an earpiece that would allow Dugan to communicate with him, and robbed the bank. When the robbery was completed, Hawkins gave all the money to Dugan. They drove to a site east of Boise and Dugan removed the vest.

Continuing his version of the events, Hawkins further testified that he was again contacted by these people in June, 2006.[6] First, they tried to contact him by telephone, but he did not answer. Then later, as he was sitting in his van in a parking lot, Winters and Dugan walked up to the van and told him that he needed to answer the phone. They then told him that they were going for a ride, and so they did. Winters was exceedingly upset because Hawkins had emailed his contact in Israel about a nonnuclear, nonhazardous explosive propellant shipment. Hawkins had warned the Israeli connection that this material was being shipped to Beirut or Haifa in containers marked "U.S. Aid." Again they drove to the "Corpus Christi" site. A bomb vest was again placed on Hawkins and he was instructed to bring back $15,000 as an interest payment for the missile guidance chip he had lost. For his part, Hawkins was upset regarding shipments that were not in accord with a joint Israeli-American operation. Dugan told Hawkins that since Hawkins was not willing to help out their friends in the community that included several named, well-known Boise businessmen, Hawkins "was going to have to make a payment." At that time, Winters made threats to Hawkins' wife and children who were on their way to the location. Winters also threatened to shoot Hawkins in the leg. Winters rode with Hawkins in the van back to Boise and stopped at a sports' park complex bearing the surname of one of the Winters/Dugan group's friends, where Winters forced Hawkins to write a demand note for the next robbery. They then drove to an apartment location and parked the van. Hawkins walked to the bank and gave the teller the note demanding exactly $15,000 because that

---

[6] At a hearing outside of the presence of the jury, Hawkins stated that he was also contacted by the same men in March 2006, when they forced him to rob a bank in Bozeman, Montana. This information was later supplied to the jury by Hawkins on cross-examination and in his redirect examination of himself.

was the amount Winters had ordered. At this second robbery, Hawkins was very concerned because he had not heard back from George Calley, so when he left the bank, he said to the tellers: "My name is Faron Hawkins. Would you please call George Calley." Hawkins said he had no choice other than to rob the banks because he believed that his and his wife's and his children's lives were in danger.

Hawkins related that his past experiences, like driving a forty-eight-foot commercial trailer into Canada knowing that if he was caught with the unspecified contents, he would not be under the protection of the United States, and having sole responsibility for a program called the "Token Program" which involved shipping items between various places including forts and the like, taught him how to control his emotions enough to do what he had to do, like the robberies. He said he had used a border crossing into Canada that the FBI wanted to know about, and that he was willing to share this information. The FBI was interested in the location because it was the number one location used by the U.S. intelligence community for transportation of "black ops" materials. He said that in his work with Winters and Dugan, he was given an actual U.S. government identification and entered secure places. He also saw them kill five people. Additionally, they hurt Hawkins, leaving him with a scar on his leg. He said that Winters and Dugan worked for Richard Armitage, Undersecretary of Defense. Under threat of damage from a substance called cesium, Hawkins shipped weapons-grade material for them as well as waste products and ordnance from such locations as the Idaho Nuclear Engineering Laboratory, Bechtel-Hanford, Edwards Air Force Base and Fort Bragg in Fayetteville, North Carolina. He said that he was "in charge of their funding ops which transported product in 48,102 trailers across the border at Windsor [Bridge]" in Detroit, Michigan. He also attempted to disclose his involvement in shipping sidewinder missiles but was stopped by a relevancy objection from the state. He said that although he was told to wear a disguise during the bank robberies, he decided not to but instead to inform someone that his name was Faron Hawkins and to get help from George Calley. He said that he tried to contact Calley between the robberies but was unsuccessful; that there was no one else he could turn to because he had burned all his bridges with the local community and the government by turning against the people who had caused him to do the robberies. He said that Dugan, Winters and Armitage knew most of the prominent families in Boise and had a lot of control over the local government. He testified that he had told one of the investigating officers that his parents, who lived in Idaho, were actually adoptive

11

parents and that his real parents were Israeli. He said that he was known by the Israeli name of "Abel Mott" and by an alias, David Hawks.

Hawkins also presented testimony by FBI agent Scott Mace in his defense. Mace testified that Hawkins had told him about Winters and that Hawkins had made calls to the Israeli Consulate in San Francisco. Mace said that phone records showed the Consulate had returned a call to Hawkins on the date of the first robbery. That call lasted more than ten minutes. The records also showed calls to George Calley and to the FBI. On cross-examination, Mace testified that he found on the Internet the phone number that Hawkins had used for the Israeli Consulate. He further testified to an investigative effort which showed that Hawkins' calls to the Consulate went to an answering machine and that no one could recall calling Hawkins back.

In rebuttal, the state called Detective Rosenbraugh. She testified that the first thing Hawkins told her shortly after his arrest in Oregon was about being a CIA operative and having participated in transportation of weapons to Canada and involvement in a South American operation with National Security Advisor Negroponte. He told her about cutting a transponder out of his body. She said Hawkins told her about registering his van in the name of a corporation so that if they were stopped for a traffic violation he could avoid detection of his identity, and he discussed the types of radio frequencies used by the Boise police as it related to robbery work. He admitted he had committed the December 2005, robbery in Boise, and that he had shot people before but had not killed anyone. In another interview with the detective a few days later, Hawkins said that he was concerned that not everything he had said before was true and that a lot of his memories came to him at night. He did not say anything about being forced to commit the robberies by use of a bomb vest. She testified that Hawkins had a plan to escape at the time of his arrest that involved a shootout with the police. She testified that after the interviews she suggested that Hawkins talk to a therapist at the jail.

Agent Mace was called as a rebuttal witness by the state. He testified that during a noon recess he used the Google program on the Internet and discovered that bentonite was a form of clay. He said that Hawkins at one point in the interview wanted to recant all that he had said earlier and that the robberies were committed because of his wife's need for money. He implicated his wife as an accomplice in the robberies committed by his stepson. Mace said that Hawkins did not bring up the bomb vest or being forced to commit robberies until several months into the interview process. Eventually, Mace quit talking to Hawkins because Hawkins

was not giving credible or useful information. Mace felt that Hawkins was taking national news stories and calling Mace claiming to have information about situations, but it was all very vague and ambiguous. Hawkins had told Mace that someone had taken him to a parking lot in Oregon and demonstrated the bomb vest by blowing up an ATM machine. However, when Mace checked with Oregon authorities, Hawkins' story could not be confirmed. At one point, Hawkins claimed to have information about the nation of Dubai's proposal to manage U.S. ports and the possibility of a nuclear device coming into the United States on a container ship. Agent Mace also testified that the Department of Energy does not, to his knowledge, transport radioactive material on unguarded trucks owned and driven by private contractors. He related that at one point Hawkins claimed that Winters was buying submarines from the former Soviet Union. He testified that, to his knowledge, the FBI does not have an intern program wherein nineteen or twenty-year-old people are used to wiretap corporations, and that the Department of Defense does not transfer sidewinder missiles or that sort of weapons on private trucks.

Hawkins' behavior and his stories consistently raised questions as to whether he had a rational understanding of the proceedings against him even though he appeared capable of preparing and arguing his own defense. All of these behaviors, statements, and events should have raised a bona fide doubt about Hawkins' competency to stand trial and to conduct his own defense. Taking into account all of the indicia of bizarre notions demonstrated before trial started, there was enough evidence in this case to put the district court on notice that Hawkins' competence was in question. Even if the pretrial conduct was insufficient to call for a competency evaluation, certainly Hawkins' testimony during the trial presented compelling indicia that he was not in touch with reality. When taking the entire record into account, the district court should have entertained a reasonable doubt about Hawkins' mental competency either to stand trial or to represent himself. Therefore, the district court's failure to *sua sponte* order a mental evaluation and make a determination as to Hawkins' competency was an abuse of discretion.

13

Because it is not possible to retroactively make a determination as to Hawkins' competency at the time he was tried, we must vacate the judgment of conviction and leave the state free to retry Hawkins if he is found to be competent to stand trial.[7]

## III.

## CONCLUSION

The district court abused its discretion when it did not *sua sponte* order a psychiatric evaluation and conduct a hearing to determine Hawkins' competence to stand trial because there was enough indicia existing to raise a bona fide doubt as to Hawkins' mental competency. Therefore, we vacate the judgment of conviction and remand the case for further proceedings in accordance with this opinion.

Chief Judge LANSING and Judge MELANSON **CONCUR**.

---

[7] If, under the provisions of Title 18, chapter 2, Idaho Code, the district court finds that Hawkins is not competent to stand trial then the court must commit Hawkins to the custody of the director of the State Department of Health and Welfare pursuant to I.C. § 18-212.